# UNITED STATES DISTRICT COURT

for the

Eastern District of California

**FILED**

**MAY 16 2019**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

| | |
|---|---|
| United States of America | ) |
| v. | ) |
|  | ) |
| JAMAINE DONTAE BARNES; | ) Case No. |
| JAMAR DEONTAE BARNES; | ) |
| VINCENT ISAIAH PATTERSON; | ) |
| KAVIEO DAESHAUN LEE WILEY; | ) |
| JEREMY JEROME BARNETT; | ) **2:19-MJ-0077    AC** |
| TASHAWN TERRELL DICKERSON; | ) |
| JOHNESHA DENAE THOMPSON; and | ) |
| LAMONT MONTEZ THIBODEAUX | ) |
| *Defendant(s)* | |

**SEALED**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____(see below)_____ in the county of _____San Joaquin_____ in the

_____Eastern_____ District of _____California_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1) and 846 | Conspiracy to Manufacture, Distribute, and Possess with Intent to Distribute Pills Containing Fentanyl, Heroin, Methamphetamine, and U-47700 (beginning on a date unknown but no later than November 14, 2016 and continuing through the present) [Jamaine BARNES, Jamar BARNES, Vincent PATTERSON, Kavieo WILEY, Jeremy BARNETT, and Johnesha THOMPSON]; |
| 21 U.S.C. § 841(a)(1); | Distribution of Fentanyl (October 19, 2018) [Jamaine BARNES and Jeremy BARNETT]; |
| 21 U.S.C. § 841(a)(1); | Possession with Intent to Distribute a Mixture or Substance Containing at least 50 grams of Methamphetamine (April 26, 2019) [Jamaine BARNES and Tashawn DICKERSON]; |
| 21 U.S.C. § 841(a)(1); | Possession with Intent to Distribute a Mixture or Substance Containing at least 50 grams of Methamphetamine (May 8 , 2019) [Jamaine BARNES and Vincent PATTERSON]; |
| 21 U.S.C. §§ 841(a)(1) and 846; | Attempt to Possess with Intent to Distribute a Mixture or Substance Containing at least 50 grams of Methamphetamine (May 8, 2019) [Lamont THIBODEAUX]; |
| 21 U.S.C. § 841(a)(1); and | Distribution of a Mixture or Substance Containing at least 50 grams of Methamphetamine (May 9, 2019) [Jamaine BARNES and Kavieo WILEY]; |
| 21 U.S.C. §§ 841(a)(1) | Distribution of a Mixture or Substance Containing at least 500 grams of Methamphetamine (May 14, 2019) [Jamaine BARNES and Kavieo WILEY] |

**[CONTINUED ON NEXT PAGE]**

**SEALED**

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Matthew T. Clayton
Drug Enforcement Administration

*Printed name and title*

Sworn to before me and signed in my presence.

Date: ___5/15/19___

_____
*Judge's signature*

City and state: ___Sacramento C.A___

Allison Claire, U.S. Magistrate Judge

*Printed name and title*

# AFFIDAVIT OF DEA SPECIAL AGENT MATTHEW T. CLAYTON IN SUPPORT OF SEARCH WARRANTS AND CRIMINAL COMPLAINT

1.  I, Drug Enforcement Administration ("DEA") Special Agent Matthew T. Clayton, being duly sworn, hereby state:

## SCOPE OF REQUESTED SEARCH WARRANTS

2.  This affidavit supports an application for warrants to search the locations, vehicles, and persons further described below and in **Attachments A-1 through A-12**. The contraband, objects, and information for which we will search are described in **Attachments B-1 and B-2**. Attachments A-1 through A-11 and Attachments B-1 and B-2 are incorporated by reference.

3.  We request authority to search the following locations for the items described in **Attachment B-1**:

      i.  **4410 N. Pershing Avenue, #C-24, Stockton, California 95207** (Stash Location and Distribution Center for the Jamaine BARNES DTO), more fully described in **Attachment A-1.**
      ii.  **1139 Parma Road, Stockton, California 95206** (Stash House and Pill Press Location for the Jamaine BARNES DTO), more fully described in **Attachment A-2.**
      iii.  **723 Bedlow Drive, Stockton, California 95210** (Pill Press Location for the Jamaine BARNES DTO and Residence of Jamar BARNES), more fully described in **Attachment A-3**.
      iv.  **2518 Briarcliff Drive, Stockton, California** 95206 (Recent Residence of Jamaine BARNES), more fully described in **Attachment A-4.**
      v.  **4420 Janell Lane, Stockton, California 95206** (Recent Residence of Jamar BARNES), more fully described in **Attachment A-5.**
      vi.  **32 W. Willow Street, Stockton, California 95202** (Residence of Vincent PATTERSON), more fully described in **Attachment A-6.**
      vii.  **1011 Rosemarie Lane, Apt. 109, Stockton, California 95207** (Residence of Alexander WELCH), more fully described in **Attachment A-7.**
      viii.  **411 S. Stanislaus Street, Apt. J205, Stockton, California 95203** (Residence of Chevele RICHARDSON), a residence more fully described in **Attachment A-8.**
      ix.  **Silver 2014 Buick LaCrosse, bearing California license plate 8ECW699** (Vehicle Used by Jamaine BARNES), more fully described in **Attachment A-9.**

1

    x.    **Blue 2004 Dodge Durango, bearing California license plate 5HAY528** (Vehicle Used to Deliver Methamphetamine-Laced Pills to Tashawn DICKERSON), more fully described in **Attachment A-10**.

    xi.    **4410 N. Pershing Avenue, #C-25, Stockton, California 95207** (Firearms Stash Location for the Jamaine BARNES DTO), more fully described in **Attachment A-11**.

4. We request authority to search of the following location and persons for the documents and electronic devices described in **Attachment B-2**:

    i.    **2229 Royal Street, Stockton, California 95210** (Residence of Johnesha THOMPSON and Former Stash House and Pill Press Location), more fully described in **Attachment A-12**.

    ii.    Kadrena Latrice WATTS.

    iii.    Chevele Bernard RICHARDSON.

    iv.    Alexander Deavonte WELCH.

### SCOPE OF REQUESTED CRIMINAL COMPLAINT

5. This affidavit also supports an application for a criminal complaint and arrest warrants for:

    i.    Jamaine Dontae BARNES
          (Counts 1-4, 6-7)

    ii.    Jamar Deontae BARNES
          (Count 1)

    iii.    Vincent Isaiah PATTERSON
          (Counts 1, 4)

    iv.    Kavieo Daeshaun Lee WILEY
          (Counts 1, 6, 7)

    v.    Jeremy Jerome BARNETT
          (Counts 1, 2)

    vi.    Tashawn Terrell DICKERSON
          (Count 3)

    vii.    Johnesha Denae THOMPSON
          (Count 1)

    viii.    Lamont Montez THIBODEAUX
          (Count 5)

COUNT ONE – Conspiracy to Manufacture, Distribute, and Possess with Intent to Distribute Pills Containing Fentanyl, Heroin, Methamphetamine, and U-47700, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

COUNT TWO – Distribution of Fentanyl, in violation of 21 U.S.C. § 841(a)(1) (October 19, 2018).

COUNT THREE – Possession with Intent to Distribute a Mixture or Substance Containing at least 50 grams of Methamphetamine, in violation of 21 U.S.C. § 841(a)(1) (April 26, 2019).

COUNT FOUR – Possession with Intent to Distribute a Mixture or Substance Containing at least 50 grams of Methamphetamine, in violation of 21 U.S.C. § 841(a)(1) (May 8, 2019).

COUNT FIVE – Attempt to Possess with Intent to Distribute a Mixture or Substance Containing at least 50 grams of Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (May 8, 2019).

COUNT SIX – Distribution of a Mixture or Substance Containing at least 50 grams of Methamphetamine, in violation of 21 U.S.C. § 841(a)(1) (May 9, 2019).

COUNT SEVEN – Distribution of a Mixture or Substance Containing at least 500 grams of Methamphetamine, in violation of 21 U.S.C. § 841(a)(1) (May 14, 2019).

## BACKGROUND AND EXPERTISE

6. I am a Special Agent of the United States Department of Justice, Drug Enforcement Administration (the "DEA"). I have been a DEA Special Agent since September 2004. I am currently assigned to the DEA Sacramento District Office ("SDO") charged with investigating major drug trafficking organizations operating in the Eastern District of California. I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

7. I was trained as a DEA Special Agent at the DEA/FBI Academy, Quantico, Virginia. During my training, I received special training in the Controlled Substances Act, Title 21

3

United States Code, including, but not limited to, Sections 841 and 846, Controlled
Substance Violations and Conspiracy to Commit Controlled Substance Violations,
respectively. I have received special training regarding criminal organizations engaged in
conspiracies to manufacture and/or possess with intent to distribute fentanyl, counterfeit
pharmaceutical tablets, ecstasy/MDMA, methamphetamine, cocaine, cocaine base,
heroin, marijuana, and other dangerous drugs prohibited by law. I received further
training in search and seizure law and many other facets of drug law enforcement
including clandestine laboratory investigations.

8.     As a DEA agent, I have assisted in the execution of search warrants on many occasions
       for controlled substances and/or related paraphernalia, indicia, and other evidence of
       violations of federal drug statutes. I have participated in multiple investigations targeting
       individuals and organizations trafficking fentanyl, counterfeit pharmaceutical tablets,
       ecstasy/MDMA, cocaine, heroin, marijuana, methamphetamine and other drugs. During
       the course of these investigations, I have become familiar with the manner in which drug
       traffickers use telephones, often cellular telephones, to conduct their illegal operations. I
       have participated in wire interception cases encompassing multiple telephones and have
       previously written wire interception affidavits. Furthermore, I have served as both a
       monitor and wire room supervisor on federal wiretap investigations. Additionally, I have
       attended the California Department of Justice's eight-hour wire interception certification
       course, as set out in California Penal Code § 629.94.

9.     Through my training, experience, and interaction with other experienced Special Agents,
       Task Force Agents, and other drug investigators, I have become familiar with the
       methods employed by drug traffickers to smuggle, safeguard, store, transport, and
       distribute drugs, to collect and conceal drug related proceeds, and to communicate with
       other participants to accomplish such objectives. These methods include the use of
       telephones, pre-paid or debit calling cards, public telephones, wireless communications
       technology such as paging devices and cellular telephones, counter-surveillance,
       elaborately planned smuggling schemes tied to legitimate businesses, and use of codes in
       communications in an attempt to avoid detection by law enforcement. Based on my
       training and experience, I also know that violators of the controlled substances laws often
       purchase telephones or subscribe to telephone service using false names and/or other
       individuals' names to avoid detection by law enforcement.

10.    In addition to my personal knowledge, this affidavit is based on (1) information I
       obtained from related investigations; (2) conversations with other law enforcement
       officers including oral and written investigative and laboratory reports that I received
       directly or indirectly from other law enforcement officials; (3) review and analysis of
       information received from various sources, including evidence provided pursuant to

                                         4

subpoenas and search warrants, such as GPS tracking data; (4) physical surveillance conducted by law enforcement officials reported to me either directly or indirectly; (5) a review of public records, telephone toll records, and subscriber information; (6) information provided from confidential sources of information, cooperating defendants, and other sources of information working with law enforcement agencies; (7) a review of driver's license and automobile registration records; (8) records from various law enforcement databases, including but not limited to the National Law Enforcement Telecommunications System ("NLETS") and the National Crime Information Center ("NCIC"); (9) my training and experience as a DEA agent and/or; (10) the training and experience of other law enforcement officials with whom I consulted during this investigation and the preparation of this Affidavit. This affidavit is also based upon Title III intercepts of telephone number 559-330-4452 (**Target Telephone 1** or **TT#1**), used by Jamaine BARNES. Pursuant to those intercepts, I have reviewed transcripts and audio recordings of intercepted telephone calls from **Target Telephone 1**.

11. Because this affidavit is submitted for the limited purpose of supporting the requested search warrants, criminal complaint, and arrest warrants, I have not included the details of every aspect of the investigation. I have set forth only the facts that I believe are necessary to establish a foundation for an order authorizing the search and seizure of the property identified in this affidavit.

## **OVERVIEW OF THE INVESTIGATION**

12. Since April 2016, agents and officers of the DEA's Sacramento District Office (SDO) have been conducting an investigation into the Jamaine BARNES Drug Trafficking Organization (DTO), which is a drug trafficking enterprise engaged in, among other things, the manufacture (via pill-press machine(s)) and distribution of large quantities of counterfeit pharmaceutical tablets containing fentanyl and other controlled substances, as well as purported ecstasy/MDMA pills containing methamphetamine and other controlled substances, in the areas of Stockton, California and elsewhere. During this investigation, multiple controlled purchases of counterfeit pharmaceutical tablets were conducted by confidential sources from multiple sub-distributors within the Jamaine BARNES DTO. Additionally, counterfeit pharmaceutical and/or purported MDMA tablets containing controlled substances were seized on multiple occasions from various Jamaine BARNES DTO members during the course of this investigation.

13. Between the period of April 18, 2019 through the date of this Affidavit, Title III intercepts were authorized on **Target Telephone 1**, used by Jamaine BARNES. During this period, Jamaine BARNES spoke explicitly with his co-conspirators about his

counterfeit pharmaceutical and/or purported MDMA tablet manufacturing and distribution operations.

14. I have divided the remainder of this affidavit is divided into three sections. First, in the Statement of Probable Cause, I describe the facts and circumstances necessary to establish probable cause to search the target locations and to issue the requested criminal complaint and arrest warrants. Second, in the Summary of Evidence Related to Search Locations, I provide an overview of the key evidence establishing probable cause for each of the requested location search warrants. Third, in the section Affiant's Experience Regarding Items to be Seized, I provide additional support for my belief that the items listed in **Attachments B-1 and B-2** are likely to be found in the locations to be searched.

### STATEMENT OF PROBABLE CAUSE

## *In April 2016, an anonymous tipster says Jamaine BARNES is using a pill press to make fentanyl-laced pills and distributing them throughout much of northern California.*

15. In April 2016, an anonymous caller provided the DEA SDO Tactical Diversion Squad ("TDS") with information about Jamaine BARNES that became the basis for initiating this investigation. The caller stated that Jamaine BARNES resided in Stockton, CA and had possession of at least one pill press machine and possibly more. The caller further stated that Jamaine BARNES manufactured and distributed counterfeit pharmaceutical tablets containing fentanyl in the San Joaquin, Sacramento and Bay Area regions of California. The caller stated that Jamaine BARNES manufactured and distributed both hydrocodone and Xanax pills containing fentanyl, and that Jamaine BARNES ordered fentanyl from China through internet websites. The caller stated that Jamaine BARNES paid for the fentanyl through Western Union transactions. An agent texted a CA DMV photo of Jamaine BARNES to the caller, which the caller positively identified to be that of Jamaine BARNES.

## *A July 2016 e-mail search warrant shows Jamaine BARNES purchasing a pill press and pill dies from China.*

16. In late March and early April 2016, the DEA was investigating multiple suspected and confirmed fentanyl overdose deaths that occurred in the Sacramento area. During that timeframe, approximately fifty-two individuals in the greater Sacramento area overdosed on fentanyl linked to counterfeit narcotics tablets; twelve of these individuals died from overdoses. Subsequent investigation revealed that those who overdosed had ingested

6

counterfeit hydrocodone/acetaminophen tablets that contained approximately six to seven milligrams of fentanyl or fentanyl analogues.

17. Several of the overdoses were specifically linked to pills labeled "M367," including some of the fatality overdoses. In general, M367 is a pill containing acetaminophen and hydrocodone bitartrate, commonly used for pain relief. It is a Schedule II narcotic under the Controlled Substances Act (the "CSA"). Authentic M367 pills are manufactured by Mallinckrodt Pharmaceuticals ("Mallinckrodt"). Law enforcement believes that the fentanyl-laced M367 pills that caused the overdoses were not manufactured by Mallinckrodt, but instead in a clandestine laboratory.

18. Based on my training and experience, I know that clandestine manufacturers of counterfeit pills use "pill dies" and "pill presses" to make their pills. Generally speaking, pill dies imprint a particular logo or code on a given pill, which can be used by counterfeiters to pass off as authentic pills. Pill presses are used to "press" the dies and create discrete pills.

19. In July 2016, Northern District of California United States Magistrate Judge Kandis A. Westmore authorized a federal search warrant (4-16-70823 KAW) for email accounts kostooling@hotmail.com and punch-designer@hotmail.com. The DEA Oakland Resident Office obtained the search warrant as part of its investigation into counterfeit Norco (hydrocodone) pills containing fentanyl, during which it determined these e-mail addresses were linked to the importation of pill presses and pill dies into the United States from China. During a search of the e-mails for "M367" (an imprint on hydrocodone pills), several e-mails were discovered between addresses kostooling@hotmail.com, jamaineb01@gmail.com, and business_lady05@hotmail.com. Based on the seized e-mails, Jamaine BARNES appears to have used the jamaineb01@gmail.com and business_lady05@hotmail.com addresses, as detailed in the examples below.

20. On February 17, 2016, the e-mail address kostooling@hotmail.com sent a message to business_lady05@hotmail.com titled "*m523 and M367 punch dies for TDP-5 from punchdies.com.*" The message stated as follows: *Hello Jamaine BARNES, Thank you for your order in our KOS FACTORY. We know you order 2 set punch dies and pay to our paypal account: Punch-designer@hotmail.com. We received your order payment. So sorry deal with your order late. Because of the New Year Holiday in China, we have a long holiday. Now we go back to work. Pleae* [Please] *confirm the details of your order: Machine model: TDP-5; Punch dies shape: Irregular shape. Quantity: 2 set; 1 set M367 punch dies: Size 15mm \* 6mm; Total style: Standard Concave; 1 set M523 10/325 punch dies; Size: 15mm \* 7MM; Tablet style: Flat faced bevel edge; Shipping address: jamaine*

7

*barnes, 2229 royal st, Stockton, ca 95210, USA. Please confirm the details of your order and provide phone number to us, ok? These 2 punch dise* [dies] *need 10-15 days to custom make. When the punch dies finished we will ship by DHL to you. Any questions, please let us know! Thanks KOSTOOLING*

21.   Based on the foregoing, law enforcement believes that Jamaine BARNES used the e-mail address business_lady05@hotmail.com to purchase a pill press and dies to create M367 and M523 pills. As will be shown later in this affidavit, the shipping address of 2229 Royal Street, Stockton, CA is also known to be associated with Jamaine BARNES.

22.   From my investigation in this case, I have learned that a TDP-5 pill press, like the one noted in the e-mail message described above, is available to purchase from online vendors and costs in the price range of approximately $1,500. I have also learned that it can produce up to 5,400 pills or tablets per hour. I also know from my experience while conducting this investigation that "M523" is a tablet containing acetaminophen and hydrocodone bitartrate, commonly used for pain relief and is a Schedule II narcotic under the CSA. It is similar in composition to M367 and is also manufactured by Mallinckrodt.

23.   On the same date as the previous message, February 17, 2016, kostooling@hotmail.com sent jamaineb01@gmail.com an e-mail forwarding the above message with two attachments, which were photographs of each die referenced in that message – "M523" and "M367." The recipient e-mail address, on its face, can be associated with the name "Jamaine Barnes."

24.   On March 1, 2016, jamaineb01@gmail.com sent kostooling@hotmail.com an e-mail titled "*Tablet Die*" which stated as follows: *Hello I'm wondering can you make these die for me. Size 14.00 mm; Shape elliptical/oval; Imprint: 176.. I want just like the picture.. So can u play do just alike and I want two copies of that stamp....look how the 6 is on there.* This e-mail contained an attachment of a white oval pill with "176" imprinted on it.

25.   On the same date as the previous message, March 1, 2016, kostooling@hotmail.com sent jamaineb01@gmail.com an e-mail titled: *Re: tablet die*, which stated as follows: *Hello friend, Our factory can help you custom make the 176 punch dies for your TDP-5. You need 2 set? The length is 14mm, what's the size of the width? The price of the 176 punch dies: 150USD/SET; 2 SET: 150\*2=300USD; DHL cost: 50USD; Total price: 350USD; Payment information: Western Union info: First name: WANTING; Last name: LI; Country: China; Any questions, please let us know! Thanks*

26.     On March 4, 2016, kostooling@hotmail.com e-mailed jamaineb01@gmail.com to confirm that the "176" dies had been shipped via DHL.

27.     From my experience while conducting this investigation, I know that "176" is a tablet containing acetaminophen and hydrocodone bitartrate. This tablet is commonly used for pain relief and is a Schedule II narcotic under the CSA. It is manufactured by Sun Pharmaceuticals Industries, Inc.

28.     On May 5, 2016, kostooling@hotmail.com sent a message to jamaineb01@gmail.com which stated as follows: *Because recently the United States Customs supervision of this product is very strict, all pill dies order we will ship by EMS delivery to our customers.* I believe "EMS delivery" refers to Express Mail Service, an international postal cooperative network. The U.S. Postal Service offers EMS delivery through "Priority Mail Express International."

29.     Based on the foregoing, I believe that Jamaine BARNES has used the e-mail accounts jamaineb01@gmail.com and business_lady05@hotmail.com to acquire a pill press and dies to manufacture counterfeit M367, M523 and 176 pills for unlawful distribution.

30.     There is also evidence suggesting that Jamaine BARNES has purchased dies to produce other tablets of controlled substances as well. In addition to the foregoing e-mails, additional e-mails between kostooling@hotmail.com and jamaineb01@gmail.com revealed purchases of dies sent to Jamaine BARNES, specifically on May 10, 2016, which included shapes and characters attached to the e-mails of Darth Vader, the Teenage Mutant Ninja Turtles, and Garfield the Cat.

31.     From my training and experience, I know that these dies are consistent with the manufacture and distribution of Ecstasy/MDMA tablets. I also know that it is common for Ecstasy traffickers to "brand" their product with a specific character (such as a cartoon logo) to make their products distinctive and unique. Ecstasy/MDMA is a Schedule I narcotic under the CSA making it unlawful to distribute.

### *E-mail search warrants from October and November 2016 show Jamaine BARNES buying the synthetic opioid U-47700 and chemicals for MDMA/Ecstasy from China*

32.     In October and November 2016, the DEA SDO obtained federal search warrants in the Eastern District of California (2:16-SW-0602 AC and 2:16-SW-0732 KJN) for the e-mail address jamaineb01@gmail.com, utilized by Jamaine BARNES, under which Google provided records from the date range of January 16, 2016 to November 22, 2016.

9

33. The e-mail communications obtained for the account jamaineb01@gmail.com indicated that, on no fewer than five different occasions between January 29, 2016 and September 9, 2016, Jamaine BARNES had ordered chemicals, including U-47700, for shipment from China to 2229 Royal Street, Stockton, CA. Through my training and experience, I know that some of the chemicals ordered and shipped to 2229 Royal Street, such as U-47700 and chemicals associated with the production of MDMA, are used in the manufacture of illicit/counterfeit tablets and MDMA/Ecstasy tablets. I am also aware that China has been an identified source of chemicals (such as U-47700 and various fentanyl derivatives) for counterfeit pharmaceutical tablet manufacturers in the United States.

34. Based on my training and experience, I know that U-47700 is a synthetic opioid with a pharmacological profile similar to morphine. U-47700 has been associated with overdoses and overdose-related deaths across the United States. U-47700 was declared a Schedule I controlled substance in the United States on November 14, 2016.

35. An example of a seized e-mail discussing the purchase of U-47700 was sent on April 13, 2016, from jamaineb01@gmail.com to emmayuanyan@163.com. The e-mail was titled "*Re: U-47700*" and stated the following: *Hi friend here is the payment information, it's for $2250 payment making the total payment for 500g U-47700 is $4500 USD... Calvin Crosby, 2229 royal st., Stockton, CA 95210.* The e-mail further stated: *And you can send package to same name and address of the sender please thank you.*

36. In another seized e-mail sent from kostooling@hotmail.com to jamaineb01@gmail.com on March 11, 2016 regarding an order for pill press dies, the following consignee address and phone number was listed: "Jamaine barnes, 2229 royal st, Stockton CA 95210, United States, Phone: 5103095370."

37. Later on in this investigation, in an effort to corroborate a link between the 2229 Royal Street location and Jamaine BARNES, agents conducted physical surveillance of Jamaine BARNES, monitored court-ordered tracking information on vehicles that he has driven, monitored geolocation information (2:17-SW-336 CKD) on a phone he is believed to have used (510-309-5370), and observed the front of 2229 Royal Street via a pole camera. From these various efforts, investigators observed Jamaine BARNES visit the 2229 Royal Street location frequently, though he did not appear to live there. For instance, geolocation on 510-309-5370 indicated that the user of the phone was in close proximity to 2229 Royal Street on no fewer than twelve separate days between May 10 and June 9, 2017. During this same period of time, the information also showed that the phone was in close proximity to a residence of BARNES' located at 2518 Briarcliff Drive, Stockton, California during nighttime hours.

10

*In October 2016, a source tells DEA that Jamaine BARNES was pressing pills at a*
*stash house at 2229 Royal Street in Stockton but moved the pill press after suspecting*
*law enforcement scrutiny*

38. In October 2016, agents of the DEA SDO interviewed Source of Information #1 ("SOI-1") who had come forward with information regarding the Jamaine BARNES DTO. SOI-1 provided statements to law enforcement related to his/her personal knowledge about the Jamaine BARNES DTO. SOI-1's identity is known to law enforcement. SOI-1 has a criminal history which includes a felony conviction for possession of drugs for sale, a misdemeanor conviction for use of a controlled substance, and a misdemeanor conviction for willful cruelty to a child, as well as arrests related to the possession of drugs, theft, and fraud. SOI-1was working with law enforcement in exchange for monetary compensation. In addition, SOI-1 and Jamaine BARNES had a falling out relative to their collaboration in the music business. Some of the statements made by SOI-1 were independently corroborated by law enforcement or were consistent with information already known by law enforcement prior to speaking with SOI-1, as will be detailed in following paragraphs of this section of the affidavit. I am not aware of SOI-1 providing false or misleading information during this investigation. Based on this I believe the statements made by SOI-1 to be reliable.

39. SOI-1 stated that Jamaine BARNES sells pills in "boat" quantities, meaning 1,000 pill increments. SOI-1 stated that s/he had seen Jamaine BARNES' pill press and witnessed Jamaine BARNES using the press to make pills. SOI-1 stated that Jamaine BARNES sells counterfeit Norco (hydrocodone) pills for approximately $5 per pill, counterfeit Roxy (oxycodone) pills for approximately $5 per pill, and counterfeit Xanax (alprazolam) pills for approximately $5 per pill. SOI-1 stated that Jamaine BARNES has a record label known as "Monopoly Entertainment," or MME, which Jamaine BARNES has tattooed on his face.

40. Open source information revealed that MME may stand for "Monopoly Movement Entertainment," and a review of social media revealed a photograph of Jamaine BARNES with "MME" tattooed on the left side of his face, corroborating SOI-1's statements.

41. SOI-1 stated that Jamaine BARNES was then residing at 2017 Delta Court, Stockton, CA, which was equipped with surveillance cameras. SOI-1 stated that Jamaine BARNES was also known by the alias of "Twin" and that Jamaine BARNES had a twin brother named Jamar BARNES. SOI-1 stated that the residence located at 4420 Janell Lane, Stockton, CA was associated with Jamaine BARNES's family. (Surveillance agents later

11

observed Jamaine BARNES at the 4420 Janell Lane residence, corroborating SOI-1's statements). SOI-1 further stated that the residence located at 2229 Royal Street, Stockton, CA was a "stash" location utilized by Jamaine BARNES to store drugs and a pill press. SOI-1 stated that a black female named Jonisha, who was also known as "Fatty," resided at the 2229 Royal Street residence. (Agents later identified this individual to be Johnesha THOMPSON, corroborating SOI-1's statements). SOI-1 stated that s/he assisted THOMPSON with moving a pill press, dies, mixers and tubs of powders to a storage facility after the Jamaine BARNES DTO became suspicious that law enforcement may have become aware of these criminal activities at the 2229 Royal Street residence.

42. Almost a year after SOI-1 provided this information, on September 8, 2017, agents observed via a pole camera that a U-Haul truck was parked in front of the 2229 Royal Street residence. Later that same day, surveillance agents responded to the residence and followed the U-Haul truck to a storage facility identified as Extra Space Storage, located at 55 E. Jamestown Street, Stockton, CA. An administrative subpoena was then issued to Extra Space Storage for renter information pertaining to the storage spaces. In response to this subpoena, agents learned that space #729 at Extra Space Storage was rented by Calvin CROSBY, who was previously identified as the shipping addressee at 2229 Royal Street for chemicals ordered from China, apparently by Jamaine BARNES. On September 12, 2017, surveillance agents positively identified CROSBY and THOMPSON in the immediate vicinity of Extra Space Storage unit #729.

## *In 2016, SOI-2 purchased hundreds of counterfeit pharmaceutical tablets containing the chemical U-47700 from Jamar BARNES*

43. In 2016 and 2017, Source of Information #2 ("SOI-2") provided information related to Jamar BARNES in post-arrest interviews, presumably with the hope of receiving consideration in connection with pending criminal charges. SOI-2 has a criminal history that includes several arrests related to drug sales and possession, domestic violence, and obstructing a public officer, but no known convictions. SOI-2 is no longer cooperating with law enforcement. Some of the statements made by SOI-2 were independently corroborated by law enforcement or were consistent with information already known by law enforcement, as described below. I am not aware of SOI-2 providing false or misleading information during this investigation. For these reasons, I believe the following information SOI-2 provided about Jamar BARNES to be reliable. SOI-2 stated s/he had used a friend's pill press to make hundreds of tablets found to contain the chemical U-47700 (a Schedule I controlled substance previously ordered from China by Jamaine BARNES, as detailed above) and that SOI-2 was going to sell them for money. SOI-2 would not elaborate on the friend or pill press. In a later post-arrest interview,

12

however, SOI-2 stated that s/he had purchased the tablets from a black male adult in his 30's whom SOI-2 knew as Jamar (LNU). SOI-2 stated that s/he had purchased the tablets from Jamar at a particular address, which SOI-2 then directed agents to and identified, resulting in the identification of the residence located at 3738 Luisa Kayasso Drive, Stockton, CA. Agents subsequently observed a vehicle at this residence registered to Jamar BARNES, 8119 Crestwick Dr, Houston, Texas. A commercial database query indicated that Jamar BARNES was associated with the address 3738 Luisa Kayasso Dr., Stockton, CA and had moved from Texas to Stockton, CA in 2016. Toll analysis on SOI-2's telephone number revealed frequent contact with a previous number used by Jamar BARNES on the day prior to the seizure of hundreds of pills containing U-47700 from SOI-2.

### *In June 2017, CS-1 says that in 2016 Jamaine BARNES asked CS-1 to return a batch of 2,000 pills that CS-1 purchased and discussed how he "put the wrong shit in" the pills and that some people in Sacramento had died from them*

44. In June 2017, Confidential Source #1 ("CS-1") provided information pertaining to Jamaine BARNES and members of his DTO. At the time the information was provided by CS-1, CS-1 was working with law enforcement for consideration in an on-going case related to drugs. CS-1 has a criminal history that includes misdemeanor convictions related to domestic battery and possession of a controlled substance for sale as well as arrests related to vehicle theft and burglary. CS-1 does have several other arrests on his/her criminal history, but those arrests do not appear to have resulted in any convictions. Agents were able to independently corroborate some of the information provided by CS-1 related to the drug trafficking activities of Jamaine BARNES.[1] I am not aware of CS-1 providing false or misleading information during this investigation. For these reasons, I believe the information CS-1 provided about the Jamaine BARNES DTO to be reliable. Shortly after an unsuccessful attempted controlled purchase of tablets in July 2017, CS-1 stopped communicating with investigators.

45. CS-1 stated that Jamaine BARNES, AKA "Twin," was manufacturing and distributing counterfeit hydrocodone, Xanax (alprazolam), and Ecstasy tablets using at least one pill press in a clandestine lab located at 2229 Royal Street, Stockton, CA, which was a residence occupied by Johnesha THOMPSON. CS-1 stated that Jamaine BARNES

---

[1] For example, physical surveillance and pole camera video from 2229 Royal Street has corroborated CS-1's statements that BARNES and THOMPSON used the address. In addition, in September 2017 Border Patrol agents found an apparent pill press part in a FedEx shipment to 2229 Royal Street, corroborating CS-1's statement that the location was used to press pills.

13

employed THOMPSON as a distributor of pills and as an assistant in the manufacture of pills, and that the pill press was kept in THOMPSON's bedroom at the 2229 Royal Street residence.

46. CS-1 stated that Jamaine BARNES distributed pills throughout California and also other states to include Arizona, Nevada and possibly Colorado. CS-1 stated that CS-1 had made long distance deliveries with Jamaine BARNES, who was often present during the deliveries armed with a firearm.

47. CS-1 stated that approximately one year earlier s/he had purchased a total of approximately 6,000 pills in a single month period, consisting of three purchases of 2,000 pills each, which occurred at the 2229 Royal Street residence. CS-1 stated that the pills purchased during this period included counterfeit Norco (hydrocodone), Xanax (alprazolam), and Ecstasy. CS-1 stated that following the last 2,000 pill purchase, CS-1 consumed one of the Norco pills which later made CS-1 vomit. CS-1 stated that several of CS-1's customers who received pills from this "batch" also complained of the pills making them sick.

48. In the days following CS-1's purchase of the final batch of 2,000 pills, CS-1 stated that s/he received a telephone call and text message from Jamaine BARNES who indicated that CS-1 needed to get all of the pills back because the pills were bad. CS-1 stated that s/he also received calls from one of Jamaine BARNES' sub-distributors, identified as Tiu OGBEMUDIA, who also admonished CS-1 to return the pills.[2] CS-1 stated that upon learning this, CS-1 immediately drove to 2229 Royal Street with all of the remaining pills. Upon arrival, CS-1 stated that Jamaine BARNES exchanged all of the bad pills with replacement pills, including approximately 200-250 extra pills for the inconvenience. CS-1 described Jamaine BARNES' behavior as being paranoid. CS-1 stated that both Jamaine BARNES and OGBEMUDIA told CS-1 that the pills were bad and that some people had died in Sacramento from ingesting them.[3] CS-1 overheard Jamaine BARNES and OGBEMUDIA discussing how Jamaine BARNES had "put the wrong shit in," in reference to the bad pills.

---

[2] CS-1 stated that s/he had dumped this phone as of the time of the interview and therefore no longer had records of these calls and this text message.

[3] DEA's investigation into the overdose deaths in Sacramento in 2016 is ongoing. DEA has not yet determined with certainty who is responsible for manufacturing and distributing the fatal pills, but there are and have been other suspects in addition to Jamaine BARNES.

14

*In July 2017, CS-1 attempts a controlled purchase of 1,000 Xanax pills from Johnesha*
*THOMPSON, Tiu OGBEMUDIA, and Jamaine BARNES, but Jamaine BARNES*
*cancels the transaction*

49.  In July 2017, at the direction of agents from the DEA SDO, CS-1 placed recorded
telephone calls in the presence of agents to Jamaine BARNES, OGBEMUDIA, and
THOMPSON in an attempt to arrange the purchase of 1,000 Xanax pills. During one call
to Jamaine BARNES, a male answered whom CS-1 identified as being Jamaine
BARNES. During this call, Jamaine BARNES instructed CS-1 to contact and meet with
THOMPSON for the purchase of pills. Subsequently, CS-1 called OGBEMUDIA, who
confirmed that Jamaine BARNES had already arranged with THOMPSON to sell the
pills to CS-1. However, ultimately Jamaine BARNES called CS-1 and asked where CS-1
had gotten his (Jamaine BARNES') phone number, and further admonished CS-1 never
to call the number again. Jamaine BARNES cancelled the transaction and the attempted
controlled purchase was unsuccessful.

*In September 2017, Border Patrol agents find an apparent pill press part in a FedEx*
*shipment from China to 2229 Royal Street, Stockton, CA*

50.  In September 2017, a member of the U.S. Customs and Border Protection ("CBP")
inspected a FedEx shipment entering the United States from China that was addressed to
a "Jonh Macj," at 2229 Royal Street, Stockton, CA. The package also listed a phone
number, 510-309-5370, which as described above was believed to have been previously
used by Jamaine BARNES, for which investigators had obtained geolocation information
(2:16-SW-0734 KJN). During the inspection of the FedEx shipment, CBP found that the
parcel contained a red, round gear wheel that appeared to be a large mechanical
component used in the operation of a TDP-5 pill press machine. However, because this
component is not itself illegal to possess, the parcel and contents were repackaged and
returned to complete shipment to the recipient via FedEx.

*In October 2017, eBay records show Jamaine BARNES placing bids on pill press die*
*molds*

51.  On October 10, 2017, investigators obtained and reviewed records from eBay related to
accounts that, from DEA's overall review of eBay accounts and account activity, are
known to sell and distribute items that can be used in the illegal manufacture of pills.
From my consultation with other DEA investigators, I have learned that eBay is an
internet marketplace that is available for public access. Individuals using eBay are
required to register prior to using the website to conduct purchases. Users of eBay are
required to create an individualized username that is associated with the user's e-mail

address to conduct transactions and purchases. The username and e-mail address are also associated with a name retained by eBay.

52. In the review of the records, investigators identified an account associated with the name "Jamaine Barnes," using the username "topdolla1237_9" and associated with e-mail address topdolla1237@gmail.com. Additionally, "the topdolla1237_9" eBay account also listed the following shipping address and telephone number: "Jamaine Barnes, 2518 Briarcliff dr., Stockton, CA 95206, 5103095370." These records showed that email address topdolla1237@gmail.com had made a bid during the period of February 15, 2017 and June 15, 2017 on a "R039 Stamp Die Molds Mould for candy tablet press mold pill maker TDP-0/1.5/5" and a "V3601 Die Molds Mould for candy tablet press mold pill maker TDP-0/1.5/5." These records also showed that eBay user name "topdolla1237_9" and associated e-mail address topdolla1237@gmail.com made a bid on a "Dragon Pattern 8mm Stamp Die Molds for Tablet Pill Press Machine Mould Punch" and "WATSON 853 Punching Mold Die Set Stamping Mold for Tablet Press Machine" from eBay user unitytech88.

53. Through my experience on this investigation, I know that the imprint "R039" is associated with tablets containing alprazolam, a Schedule IV controlled substance. I also know that the imprint "V3601" and "Watson 853" are associated with tablets that contain hydrocodone, a Schedule II controlled substance. Finally, I know that "TDP" is a term used to describe a series of pill presses. Taken together, I believe that these items are presses and dies to be used in the production of tablets.

54. Based on the above information obtained from eBay, I believe the user of e-mail address topdolla1237@gmail.com is involved with the purchase of pill dies. I further believe, based on the association of this account with a "Jamaine Barnes," that there is probable cause to believe that Jamaine BARNES is connected to the e-mail account.

55. A subsequent federal search warrant (2:17-SW-1071 CKD (E.D. Cal.)) executed on the topdolla1237@gmail.com e-mail address revealed additional eBay correspondence disclosing shipping addresses linked to Jamaine BARNES: 2518 Briarcliff Drive, Stockton, CA (Jamaine BARNES' in-laws' residence) and 2229 Royal Street, Stockton, CA (previously identified as a stash location of Jamaine BARNES).

### *In November 2017, Johnesha THOMPSON is arrested in Arizona with approximately 1,000 apparent MDMA pills found to contain methamphetamine and N-ethypentalone*

56. In August 2016, agents consulted DMV records and found that Johnesha THOMPSON listed 2229 Royal Street, Stockton, CA on her California driver's license. On May 11,

16

2019, agents confirmed that THOMPSON still lists 2229 Royal Street as her DMV address. As discussed, that address has been identified as a previous stash location for Jamaine BARNES' counterfeit pharmaceutical tablet manufacturing operation.

57. On November 15, 2017, THOMPSON rented a car in Lodi, CA, listing 2229 Royal Street as her address. On November 16, 2017, THOMPSON was arrested during a traffic stop in Arizona while driving the rental car. During this stop, law enforcement officers from the Navajo County Sheriff's Office (NCSO) seized over 1,000 suspected MDMA pills from the vehicle, which was driven by THOMPSON. During a post-arrest interview conducted by NCSO, THOMPSON stated in summary that she had purchased the pills in California for $500. THOMPSON also stated that she had just accepted a plea deal on a narcotics charge in Texas, and that the ecstasy pills seized in Arizona were not going to be delivered to anyone in Texas.[4] THOMPSON further stated that the ecstasy pills were for personal use and not for distribution. The SDO did not learn of THOMPSON's arrest until December 1, 2017. Agents from the SDO did not interview THOMPSON following her arrest.

58. As a sample, an orange tablet seized from THOMPSON was analyzed by an Arizona Department of Public Safety forensic scientist, who found the tablet was imprinted with the logo "Dom Perignon" and contained a usable quantity of N-ethypentalone, which is an analog of pentylone, a schedule I controlled substance. A blue tablet seized from THOMPSON was also analyzed, which was inscribed with the logo depicting a "Minion" (i.e., one of the characters from the "Despicable Me" and "Minions" movies). The blue tablet was found to contain a detectable amount of methamphetamine. I know that it is common for Ecstasy traffickers to "brand" their product with a specific character (such as a cartoon logo) to make their products distinctive and unique. The DEA Sacramento District Office subsequently took custody of the drug exhibits seized from THOMPSON and submitted the exhibits for analysis to the DEA Western Regional Laboratory (WRL); however, the results are still pending. The combined weight of the drug exhibits submitted to the WRL was approximately 506.1 gross grams.

59. Agents of the SDO did not learn of THOMPSON's arrest until December 1, 2017. Agents of the SDO subsequently reviewed pole camera footage of THOMPSON's residence located at 2229 Royal Street for the dates surrounding THOMPSON's arrest. On November 17, 2017, the day after the arrest of THOMPSON and seizure of pills, investigators observed (via pole camera footage) a white Mercedes-Benz (which Jamaine

[4] Criminal history records for THOMPSON reflect a 2017 arrest for possession of a controlled substance in Texas. The records state that the disposition of this charge was deferred.

BARNES had previously been observed driving on multiple occasions between approximately November 2016 and May 2017) arrive, park, and then depart from the 2229 Royal Street location multiple times. Investigators also observed an African-American male adult carry a large blue colored garbage bag that appeared to be full from the residence and place it in the back seat of the white Mercedes-Benz before it departed. Later, an African-American male adult was then observed carrying a box from the residence and placing it into the trunk of the white Mercedes-Benz before departing again. In my training and experience, this activity is consistent with the practice of gathering up evidence from a stash house after a person associated with that house has been arrested. During these observations, Jamaine BARNES was not positively identified as the individual observed at the location, although Jamaine BARNES is an adult African-American male.

60. Officers also seized THOMPSON's cellular telephone during the traffic stop that resulted in her arrest. THOMPSON's phone was later turned over to the DEA, which in turn obtained a federal search warrant (2:18-SW 439 AC (E.D. Cal.)) to search its contents. The telephone number of the phone seized from THOMPSON was identified as 209-426-1166, which was also subscribed in her name at the 2229 Royal Street address. Pursuant to a search of the phone's contents, multiple text messages were retrieved between THOMPSON and a telephone number (209-479-5514) believed to have been used by Jamaine BARNES.[5] Many of the text messages between Jamaine BARNES and THOMPSON had to do with narcotics trafficking. A sample of such a text message was sent from Jamaine BARNES to THOMPSON on March 29, 2017, which stated: *Come straight to my house sis I need ma drugs*. Another example was a text message sent from Jamaine BARNES to THOMPSON on April 18, 2017, which stated: *Aye nigga u still got them yellows...if not nigga bring me ma change. Or them yellows I got a move*. THOMPSON responded by text: *Im in Sacramento omw back...I sold 150 out of them and Jeff has 100*. Based on my experience with this investigation, I know that "yellows" is a term often used to describe Norco pills, or hydrocodone/acetaminophen 10/325 tablets.

---

[5] The phone number 209-479-5514 was listed in THOMPSON's phone's contact list as "Twin," a known moniker of Jamaine BARNES. In addition, toll records for 209-479-5514 show that during the period of March-June 2017, the phone was in contact with phones subscribed to Jael BARNES (the wife of Jamaine BARNES), and Target Subjects THOMPSON, CROSBY, and Jamar BARNES (the twin brother of Jamaine BARNES).

18

### *In March 2018, USPS agents find pill press dies in a package from China to 4420 Janell Lane, Stockton, CA, an address associated with Jamaine BARNES and his brother Jamar BARNES*

61.   On March 28, 2018, Homeland Security Investigations (HSI) notified the DEA SDO that the U.S. Postal Service (USPS) had identified an international package sent from China to an address in Stockton, CA. An extended border search of the package had been conducted which identified the package contents to be two pill press dies, one bearing the imprint "IP 204" and the other bearing the imprint "A / 512." I know from experience with this investigation that pharmaceutical tablets bearing the imprints "IP 204" or "A / 512" are known to contain oxycodone and acetaminophen. The mailing label of the package listed the following recipient information: Deontae BARNES, 4420 Janelle Lane, San Joaquin County, CA 95206, United States of America, Phone 5103095370. As discussed, agents have determined that Jamaine BARNES previously used telephone number 510-309-5370 and have seen Jamaine BARNES at the 4420 Janell Lane address. Furthermore, Jamaine BARNES' twin brother Jamar's middle name is Deontae and he lists 4420 Janell Lane as his address with the DMV.

### *In March 2018, suspected sub-distributor Edison REESE is arrested in Stockton with over 100 heroin-laced counterfeit pills believed to be supplied by Jamaine BARNES*

62.   On March 29, 2018, agents from DEA and HSI conducted a surveillance operation targeting Jamaine BARNES. Agents observed an Audi registered to Jamaine BARNES' wife, Jael BARNES, parked on the street in front of the residence located at 2518 Briarcliff Drive, Stockton, CA. Later on the same day, agents saw Jamaine BARNES driving the Audi in Stockton. Agents saw Jamaine BARNES park the Audi in a public area, after which Edison REESE got into the front passenger seat. From there, agents saw Jamaine BARNES and REESE drive together to a residence located at 5146 Jetty Drive, Stockton, CA, and then to the nearby 2518 Briarcliff Drive residence. At each residence, agents saw Jamaine BARNES get out of the vehicle and enter the residence before returning to the vehicle. While Jamaine BARNES was inside 2518 Briarcliff Drive, a third unidentified individual entered Jamaine BARNES's vehicle along with REESE. When Jamaine BARNES returned to the vehicle from the 2518 Briarcliff Drive residence, the vehicle departed and returned to the same public area where REESE had been picked up originally. There, REESE exited Jamaine BARNES' vehicle and got into another vehicle, and then immediately left the area. Agents maintained constant surveillance as the vehicle REESE occupied drove through Stockton, until a California Highway Patrol (CHP) officer stopped the vehicle for a violation of the California Vehicle Code. During the traffic stop, REESE was arrested and approximately 100 white oval pills (which appeared to be counterfeit) were seized. REESE stated to the arresting

19

CHP officer that he (REESE) had a prescription for the seized pills and that REESE takes the pills out of the bottles because he does not like to carry the bottles around. REESE further stated that the reason he had so many pills was because some were leftover from previous prescriptions. Following REESE's arrest, SDO agents did not interview REESE in an effort to maintain the integrity of the overall investigation.

63. Based upon the surveillance observations leading up to the arrest of REESE and seizure of pills, I believe that Jamaine BARNES supplied the seized pills to REESE.

64. The pills seized from REESE were later tested at the DEA laboratory. A DEA chemist found that the pills were all white in color, but approximately 104 tablets displayed the imprint "WATSON 853," seven tablets displayed the imprint "A333," and six tablets displayed the imprint "M367."

65. I know that pharmaceutical manufacturers use imprints such as "M367," "A333," and "WATSON 853" in concert with tablet color and shape as a unique method for a visual identification of a specific medication. I know through my training and experience that a pharmaceutically manufactured white tablet bearing the imprint "WATSON 853" or "A333" should contain oxycodone, a schedule II controlled substance, and acetaminophen. The tablets seized from REESE bearing the imprint "WATSON 853" and "A33," once analyzed, were found to contain heroin, and at least three other non-controlled substances. The tablets seized from REESE bearing the imprint "M367" were found to contain hydrocodone and acetaminophen. Based on the above, I believe the white tablets seized from REESE bearing the imprint "WATSON 853" and "A333" are counterfeit tablets containing heroin, illicitly manufactured to replicate pharmaceutically manufactured oxycodone tablets. I believe the tablets seized from REESE bearing the imprint "M367" may be legitimately manufactured hydrocodone tablets.

66. Pursuant to the arrest of REESE, officers also seized REESE's cellular telephone (assigned call number 209-271-6145). On May 17, 2018, the DEA obtained a federal search warrant (2:18-SW 439 AC (E.D. Cal.)) to search the contents of REESE's phone. Pursuant to an authorized search of REESE's phone, agents identified a telephone number known to have been used by Jamaine BARNES (510-309-5370) listed in REESE's phone's contact list under the name "Twin Rich." Open source information confirmed that Jamaine BARNES uses the moniker "Rych Twyn" on Facebook.

67. Phone toll analysis indicated that REESE's phone (209-271-6145) was in contact with Jamaine BARNES (510-309-5370) approximately 92 times from February 27 to March 21, 2018. Toll analysis also indicated that REESE (209-271-6145) was in contact with another telephone (504-494-5755) also believed to have been used by Jamaine BARNES

approximately 53 times from March 21 to March 29, 2018. Six of these contacts were short duration calls on March 29, 2018, prior to REESE's and Jamaine BARNES' meeting.

### *In 2018, CS-2 buys fentanyl-laced pills from Sergio MAYA Hernandez and Jeremy BARNETT, identified as sub-distributors for Jamaine BARNES*

68.    In early 2018, a state/local confidential source ("CS-2") provided law enforcement with information related to individuals distributing counterfeit hydrocodone and oxycodone tablets in and around Stockton, California.

69.    CS-2 was working with law enforcement in exchange for monetary compensation. CS-2 has a lengthy criminal history that includes felony convictions related to forgery, drug possession and sales, burglary, firearms, and theft, as well as numerous arrests including false identification to a police officer. Although CS-2 was willing to provide information to law enforcement, CS-2 is unwilling to testify or be identified because s/he is worried about retribution from individuals in this case if s/he were identified. Much of the information provided by CS-2 was corroborated independently by law enforcement, who observed CS-2's controlled purchases as discussed below. I am not aware of any statement made by CS-2 to be misleading or untrue. Based on the above, I believe the information provided by CS-2 related to this case to be reliable.

70.    Using the information provided by CS-2, agents were able to positively identify Sergio MAYA Hernandez and Jeremy BARNETT, as counterfeit tablet distributors in Stockton, California. Ultimately, during the first six months of 2018, CS-2 was able to conduct controlled purchases of counterfeit tablets involving MAYA and BARNETT. During two of these purchases, both MAYA and BARNETT were observed by agents. These controlled purchases were monitored by agents, but the related telephone calls and encounters were not recorded. CS-2 was monitored during the entire transactions and searched prior to and after by agents. The tablets purchased by CS-2 appeared to be hydrocodone and oxycodone tablets through cursory visual inspection by agents, based on their markings. These tablets were ultimately tested, which revealed that some contained methamphetamine and heroin and others contained fentanyl.

### *On October 19, 2018, CS-3 purchases 301 counterfeit pills containing fentanyl, heroin, and methamphetamine from Jeremy BARNETT*

71.    In the days leading up to October 19, 2018, DEA directed Confidential Source #3 (CS-3) to call Jeremy BARNETT at telephone number 209-808-2182 in an attempt to gather more information related to the operations of the Jamaine BARNES DTO. During these

21

recorded calls, CS-3 and BARNETT discussed the future controlled purchase of 500 Percocet tablets from BARNETT. Percocet is a pharmaceutical brand name used to describe tablets containing acetaminophen and oxycodone, a Schedule II controlled substance. In a recorded call on October 15, 2018, CS-3 asked BARNETT if BARNETT had any "Xans" or "Percs." BARNETT responded stating "yeah I got some Percs right now, ain't got no xannies right now." CS-3 asked BARNETT what they were going for. BARNETT responded "you can give me like three dollars a piece." BARNETT continued saying "it depends on if you buy a lot though." BARNETT asked CS-3 "you said you want five hundred?" CS-3 stated he would start out with five. BARNETT replied stating "if you get five it will be two fifty a piece." I believe that during this conversation BARNETT was saying he would sell CS-3 Percocet tablets ("Percs") for $3.00 per tablet, but if CS-3 purchased 500 tablets or more the cost would be $2.50 per tablet. I further believe CS-3 and BARNETT discussed whether BARNETT had any Xanax tablets (referred to as "Xans" and "xannies") available, and BARNETT said he did not. Xanax is a brand name used to describe pharmaceutical tablets that contain alprazolam, a Schedule IV controlled substance.

72.   It should be noted that CS-3 is currently working with law enforcement for monetary compensation. CS-3 has criminal history that includes felony convictions related to drug sales and misdemeanor convictions related to vandalism, false identification to a peace officer, obstruction of a public officer, possession of a controlled substance, and driving under the influence, as well as numerous arrests including for first-degree murder. Agents have been able to independently corroborate much of the information provided by CS-3 related to the drug trafficking activities of BARNETT and Jamaine BARNES through audio recordings and physical surveillance. I am not aware of CS-3 providing false or misleading information during this investigation. For these reasons, I believe CS-3 to be reliable.

73.   On October 19, 2018, CS-3 again contacted BARNETT at telephone number 209-808-2182. During these recorded calls, CS-3 confirmed that CS-3 would be meeting with BARNETT later that day to purchase tablets. CS-3 stated that s/he was looking for oxycodone tablets. BARNETT stated that he had "176 Norcos" and also the "blue ones." I believe that during this call BARNETT indicated that he (BARNETT) had hydrocodone tablets ("176 Norcos") available for sale to CS-3, and that BARNETT and CS-3 could also discuss a transaction involving oxycodone tablets ("blue ones"). I know through my training and experience that Norco is a brand name of a pharmaceutical tablet which contains acetaminophen and hydrocodone, a Schedule II controlled substance. I also know that tablets containing acetaminophen and hydrocodone are marked with the imprint "176," and pharmaceutical tablets containing oxycodone are known to be small, round, and blue in color.

74. Later that day, CS-3 met with BARNETT in a public parking lot in front of 4410 N. Pershing Avenue, Stockton, CA to purchase several hundred hydrocodone and oxycodone tablets. Below is a summary of events related to this controlled purchase. Agents searched CS-3 before and after the meeting with negative results. CS-3 was equipped with a concealed audio transmitter/recorder during the transaction. CS-3 was also kept under observation by agents during this transaction.

75. At approximately 1:36PM, CS-3 drove to the parking lot located at 4410 N. Pershing Avenue, Stockton, CA, the location where CS-3 and BARNETT had agreed to meet. Once in the parking lot CS-3 called BARNETT at telephone number 209-808-2182 and BARNETT said he would be coming down shortly. Approximately 15 minutes later, BARNETT called CS-3 to verify which vehicle CS-3 was parked in. Approximately 6 minutes later, CS-3 called BARNETT again and BARNETT stated that he (BARNETT) was coming down right now. Approximately two minutes later, an agent observed BARNETT walk from the area of 4410 N. Pershing Avenue, Suite C-25 and greet CS-3 in the parking lot.[6] CS-3 and BARNETT both entered CS-3's vehicle and had a brief discussion about the amount and cost of tablets to be purchased. During this recorded meeting, BARNETT stated that he had 300 "30's" and 500 "Norcos" available to sell to CS-3 for "fifteen dollars." I believe that during this conversation BARNETT offered to sell 300 oxycodone tablets ("30's") and 500 hydrocodone tablets ("Norcos") to CS-3 for $1,500 ("fifteen dollars"). After about four minutes, BARNETT got out of CS-3's vehicle and walked back inside 4410 N. Pershing Avenue Suite C-25. CS-3 remained in the parking lot. Approximately three minutes later, BARNETT returned to CS-3's vehicle and gave CS-3 an orange bottle containing approximately 301 small, round, blue tablets marked with the imprint "E / 8," and a small plastic bag containing approximately 290 white tablets bearing the imprint "176" in exchange for $1,500 in law enforcement funds. Approximately two minutes later, BARNETT left CS-3's vehicle and returned inside 4410 N. Pershing Avenue Suite C-25, while CS-3 departed the area.

76. I know through my training and experience that pharmaceutically manufactured tablets must be visually identifiable through the use of an individualized combination of color,

---

[6] In April and May 2019, surveillance agents observed the door to Suite C-25 boarded up. Based on this, and surveillance observations of the Jamaine BARNES DTO using Suite C-24 in April and May 2019, it appeared that sometime between October 2018 and April 2019, Jamaine BARNES moved his studio location from Suite C-25 to Suite C-24. However, surveillance photos taken on May 11, 2019 revealed that the door to Suite C-25 had been repaired, and on May 14, 2019 it was confirmed that the Jamaine BARNES DTO retains access to and control over Suite C-25. As described below, on May 14, 2019, Vincent PATTERSON was observed moving a firearm from Suite C-24 to Suite C-25 and then returning to Suite C-24 without the firearm.

23

shape, imprint, and size. Specifically, I know that pharmaceutical tablets containing 30 mg of oxycodone, a Schedule II controlled substance, are supplied by Epic Pharma, Inc., and can be individually identified by the color blue, a round shape, and the imprint of a stylized "E/8" on one side of the tablet. Pharmaceutically manufactured tablets containing 10 mg of hydrocodone, a Schedule II controlled substance, are supplied by Sun Pharmaceuticals Industries, Inc., can be individually identified by a white color, an oval shape, and bear the imprint of "176" on one side of the tablet. While the several hundred tablets purchased from BARNETT look identical to those pharmaceutically manufactured tablets discussed above, agents examining these tablets noted that some appeared to have imperfections such as cracks in the tablets and variations in the color shading of the blue round tablets. These imperfections are not consistent with what is seen in the production of pharmaceutically manufactured tablets, which would normally go through a quality control process before distribution. Based on this, I believed these tablets to be counterfeit. The tablets were then sent to the DEA laboratory for testing. Through chemical analysis, the blue tablets marked with the imprint "E/8" were found to weigh approximately 37 grams and to contain a mixture of the controlled substances fentanyl, heroin, methamphetamine, tramadol, and a cutting agent phenyltetrahydroimidazothiazole. The white tablets marked with the imprint "176" were found to contain only acetaminophen, which is not a controlled substance. These results confirmed that the tablets purchased from BARNETT were in fact counterfeit and not manufactured by a pharmaceutical company.

### *Toll analysis shows phone calls between BARNETT and Target Telephone 1 on October 19, 2018, both before and after CS-3's purchase of the counterfeit pills from BARNETT*

77. Telephone toll analysis of BARNETT's telephone number, 209-808-2182, for October 19, 2018, shows phone calls with **Target Telephone 1** before and after the controlled purchase of tablets from BARNETT. BARNETT's calls with **Target Telephone 1** started immediately after the first communication that day between CS-3 and BARNETT. Specifically, on October 19, 2018, at approximately 11:05AM, CS-3 placed an outbound call to BARNETT during which CS-3 negotiated the purchase of approximately 500 Percocet tablets for $2.50 each from BARNETT. During the call, CS-3 asked BARNETT, "You ready for me," and BARNETT responded, "Yeah but I just gotta go pick it up…I got it I just gotta go pick it up…I was waiting on you to call…I'll put the play in motion right now." CS-3 then responded, "Yeah man, get that man." BARNETT then asked CS-3, "You want the five?" CS-3 then responded, "Yeah I want the five hundred, you said you do two fifty right?" BARNETT then responded, "Yep." CS-3 then responded, "Ok yeah it's all good, it's all good bro." CS-3 later asked, "You got more on deck just in case anything right?" BARNETT responded, "Yeah yeah for sure."

24

CS-3 then stated "Ok ok if these check out man I'm trying to get you in there man." BARNETT then responded, "Yeah for sure, uhh, yeah, man look, they the truth, they the ones, they, man it's the truth." CS-3 then responded, "Ok ok I'm going to take your word for it man."

78. I believe that in this phone call BARNETT confirmed he would sell CS-3 500 Percocet pills for $2.50 each and stated that he just had to pick them up from his source of supply first. BARNETT did not state who had the pills. Toll analysis indicated that immediately after the call with CS-3, BARNETT made an outbound call to **Target Telephone 1** at approximately 11:07AM. The next two calls made by BARNETT were also to **Target Telephone 1** at approximately 11:43AM and 11:49AM. (As noted above, the sale to CS-3 occurred at about 2:00PM.) Based on these toll records and the recorded calls between BARNETT and CS-3, I believe that BARNETT was contacting his supplier, Jamaine BARNES, on **Target Telephone 1** to arrange the pickup of the pills that BARNETT sold to CS-3 just a couple hours later, as described above.

### *On October 22, 2018, BARNETT calls Target Telephone 1 after telling CS-3 he will find out how many pills CS-3 would have to buy to get a price break*

79. In the days following the October 19, 2018 controlled purchase of tablets from BARNETT, CS-3 contacted BARNETT to negotiate an additional controlled purchase of tablets.

80. On October 22, 2018, at approximately 2:05PM, CS-3 called BARNETT at telephone number 209-808-2182. In summary, during this recorded call, CS-3 and BARNETT discussed the quality of the tablets purchased on October 19, 2018 and CS-3 attempted to negotiate a better price on future purchases. Specifically, CS-3 asked BARNETT, "How many I got to buy to to to get a good price on this shit?" CS-3 was referring to the amount of tablets s/he would have to purchase to get a reduction in price. BARNETT eventually replied, "Let me make a call man and see what the lowest I could get it," and "I'm a see right now, I'm a see right now, Ima see how many a nigger could get." I believe BARNETT's statement indicated that he would be contacting his source of supply by phone to determine a price to provide to CS-3.

81. About 55 minutes after the end of this call, at approximately 3:00PM, CS-3 received a text message from telephone number 209-808-2182 which stated, "Call you back in 10 min." CS-3 received another text message at approximately 3:34PM, from telephone number 209-808-2182, which stated, "My nigga playing hard ball cuz he just took a loss but let me finish hollering at you and imam see if I can get it down right now 5 and ask if you spend five." Based on the above phone conversation and text messages, I believe

that BARNETT was telling CS-3 that he was contacting his source of supply to obtain the price BARNETT could provide to CS-3.

82. Agents reviewed toll records for telephone number 209-808-2182, used by BARNETT, for calls made and received on October 22, 2018. This analysis showed that BARNETT contacted **Target Telephone 1** during the exchange with CS-3. Specifically, at approximately 3:02PM, toll records show a phone call from 209-808-2182 (BARNETT) to **Target Telephone 1** which only lasted approximately four seconds. This call was immediately followed by an outgoing call from **Target Telephone 1** to 209-808-2182 (BARNETT) at approximately 3:02PM which lasted for about one minute (about two minutes after BARNETT's text message at approximately 3:00PM to CS-3 stating that BARNETT would be calling in ten minutes and approximately 32 minutes before the message to CS-3 stating "My nigga playing hard ball now…"). Based on the sequence of calls and text messages, I believe that it is likely that in the 3:02PM phone call BARNETT was talking with his supplier Jamaine BARNES on **Target Telephone 1** about CS-3's question about how many pills CS-3 would have to buy to get a price break. Additionally, during the remainder of the day, between the period of approximately 4:17PM to 9:51PM, toll records indicated that BARNETT sent four more text messages to **Target Telephone 1** and BARNETT also received a text message and a phone call from **Target Telephone 1**. I believe based on the phone calls, text messages, and toll analysis discussed above, as well as the contact between BARNETT and **Target Telephone 1** on October 19, 2018, and the other information discussed in this affidavit regarding Jamaine BARNES' involvement in the manufacture and distribution of counterfeit tablets and his use of **Target Telephone 1**, that the 3:02PM phone call between BARNETT and **Target Telephone 1** shows that Jamaine BARNES was supplying or instructing BARNETT regarding the sale of counterfeit tablets.

### *CS-3 calls TARGET TELEPHONE 1 on October 29, 2018, and speaks with a man who introduces himself as "Twin," a known moniker for Jamaine BARNES, about CS-3's prior dealing with BARNETT*

83. Prior to organizing an additional controlled purchase from BARNETT, during the early morning hours of October 24, 2018, BARNETT was arrested by the Stockton Police Department for violations related to the possession of a firearm; the gun was seized from within a parked vehicle in which BARNETT occupied the driver's seat. During the incident, BARNETT stated to the arresting officer that he (BARNETT) did not have any knowledge about the gun that officers located within the vehicle. This arrest was unrelated to the DEA investigation and BARNETT remains in state custody while the case is pending adjudication. BARNETT's cellular telephone (209-808-2182) was also seized by law enforcement pursuant to his arrest. SDO agents did not interview

26

BARNETT following his arrest in an effort to maintain the overall integrity of this investigation.

84. After learning that BARNETT was in custody, agents instructed CS-3 to try to call Jamaine BARNES at **Target Telephone 1**. On October 26, 2018, CS-3 called **Target Telephone 1** and left a voicemail. During this voicemail CS-3 left his/her name and telephone number and asked for a call back so they could do business together. On October 29, 2018, at approximately 1:27PM, CS-3 called **Target Telephone 1** again and left another voicemail. During this voicemail CS-3 stated that s/he was looking for Jmac because they had some business to take care of and CS-3 had some money for him (Jmac) because the "shit" that he had last time "flew off the shelf" – a reference to the tablets purchased from BARNETT selling quickly. On the same day, at approximately 1:42PM, CS-3 received an incoming telephone call from **Target Telephone 1** and then immediately called **Target Telephone 1** back, as was verified through computerized call records. During the recorded conversation, the user of **Target Telephone 1** introduced himself as "Twin." As discussed, Jamaine BARNES is known to use the moniker "Twin." CS-3 discussed some information related to CS-3's prior dealing with BARNETT. Jamaine BARNES stated "Mac in jail," indicating that BARNETT, whose known moniker is "J Mac," was in jail. CS-3 told Jamaine BARNES, "I was fucking with J Mac for a minute man and he went MIA on me. I was doing a little transaction and shit. You know what I'm saying, those mother fuckers flew off the shelves." And, "He [BARNETT] had the line for me bruh, I was spending cash money with this boy." I believe in this conversation CS-3 was using vague language to discuss his prior dealing with BARNETT and the purchase of counterfeit tablets in an attempt to initiate negotiations for drugs with Jamaine BARNES. Specifically, when CS-3 said, "those mother fuckers flew off the shelves," CS-3 was explaining that the tablets purchased from BARNETT sold fast and when CS-3 said "he had the line for me" CS-3 was indicating that BARNETT was his connection to counterfeit tablets. (It should be noted, however, that although in this conversation CS-3 indicated that the tablets sold fast, this was a ruse to support CS-3's cover story and the tablets purchased by CS-3 from BARNETT were seized and retained by DEA). Jamaine BARNES replied to CS-3 saying, "Just pull up to the studio, just pull up, I'll talk to you. I don't too much know what you're talking about, just pull up to the studio, you know where he was at." CS-3 responded that he could not meet Jamaine BARNES that day because he was in Los Angeles. (This was a cover story that CS-3 developed with agents because agents were not able to arrange for the law enforcement cover needed for an in-person meeting between CS-3 and Jamaine BARNES that day.)

85. Although Jamaine BARNES states in his response, "I don't too much know what you're talking about," Jamaine BARNES also said he would speak with CS-3 in person at "the

studio. You know where he was at." I believe that Jamaine BARNES was stating he would meet CS-3 at 4410 N. Pershing Avenue where the controlled purchase of tablets occurred on October 19, 2018. I believe this statement shows Jamaine BARNES' knowledge of, and involvement in, the October 19 controlled purchase. I know through my training and experience that drug traffickers are careful when discussing their drug trafficking activities over the phone as a method to avoid law enforcement, but instead often meet in person to discuss their illegal activities. I also know that drug traffickers are often extremely careful when dealing with individuals they have not met or dealt with in the past for fear they may be working with law enforcement and that traffickers will often conduct some type of vetting before dealing with an individual unknown to them. I believe in the above conversation, Jamaine BARNES was being careful not to explicitly confirm his knowledge of BARNETT's activities with CS-3 over the phone, but was willing to discuss this in person with CS-3.

### *CS-3 receives a text from Target Telephone 1 on November 3, 2018 stating "how the fuvk u get my number" and subsequent calls from CS-3 to Target Telephone 1 go unanswered*

86. Prior to being able to set up an in person meeting with Jamaine BARNES, CS-3 received the following text message from **Target Telephone 1** on November 3, 2018. "My nigga who is u and jmac said he don't know u and how the fuvk u get my number rogue period." I believe this message shows Jamaine BARNES' attempt to vet CS-3 and indicates that Jamaine BARNES had communicated with BARNETT, who is known by the nickname "Jmac," and BARNETT did not provide support for CS-3's cover story. In the following days, CS-3 called Jamaine BARNES at **Target Telephone 1** on two occasions, but CS-3's calls went unanswered. On both occasions CS-3 left voicemails on **Target Telephone 1**. During the first voicemail message, CS-3 stated that s/he had received the text message but wanted to speak in person instead of texting or phone calls. CS-3 further stated that s/he had spent "fifteen hundred" on "music" with "Jmac." CS-3 addressed the user of **Target Telephone 1** as "Twin" in the voicemail. During the second voicemail, CS-3 again addressed the user of **Target Telephone 1** as "Twin" and requested to meet in person at the "shop" because CS-3 was trying to "pick up some more music." CS-3 then requested again for the user of **Target Telephone 1** to "get back at me man, you got the number." CS-3 did not receive a response to either voicemail. I believe this to be an indication that CS-3 did not pass Jamaine BARNES' vetting process, and therefore Jamaine BARNES would not deal with CS-3.

***Text messages on BARNETT's seized cell phone show communication between
BARNETT and Target Telephone 1 about potential sales of 300 MDMA pills on
October 22, 2018 and 100 counterfeit oxycodone pills on October 10, 2018***

87. On March 14, 2019, a federal search warrant (2:19-SW-0195 DB (E.D. Cal.)) was
obtained for BARNETT's cellular telephone which was seized pursuant to his arrest. A
subsequent authorized search of the downloaded contents of BARNETT's cellular
telephone, identified as number 209-808-2182, revealed that **Target Telephone 1** was
listed as "Jamaine Daboss" in BARNETT's contacts. Agents also found numerous text
messages between BARNETT and **Target Telephone 1**. Among these were text
messages between BARNETT and **Target Telephone 1** on October 19 and October 22,
2018, both days in which CS-3 was arranging for the purchase of counterfeit
pharmaceutical pills from BARNETT. While the times of these text messages between
BARNETT and **Target Telephone 1** do not precisely surround the negotiations between
BARNETT and CS-3 on those dates, the seized text messages do reveal discussions
regarding suspected narcotics trafficking activities. For example, on October 22, 2018,
BARNETT (209-808-2182) sent the following two text messages to **Target Telephone
1**: "Bro I got a play for 3 smacks," and then sent "3 hundun." The "3 hundun" message
was the last message sent by BARNETT to **Target Telephone 1**. I know from my
training and experience that the term "smacks" is often used by drug traffickers as slang
or code for ecstasy (MDMA) tablets. I believe that BARNETT was notifying Jamaine
BARNES that he (BARNETT) had arranged a buyer for 300 MDMA pills. It should be
noted that although **Target Telephone 1** did not respond by text message to BARNETT,
approximately 48 minutes later **Target Telephone 1** did place an outgoing call lasting
more than three minutes to BARNETT.

88. Additionally, several other text messages retrieved from BARNETT's phone revealed
discussions regarding suspected narcotics trafficking activities with **Target Telephone 1**,
as follows. On September 3, 2018, BARNETT sent the following text to **Target
Telephone 1**: "Kan I by sone weed." I believe that in this text message BARNETT is
asking to buy marijuana from Jamaine BARNES. On October 10, 2018, BARNETT sent
**Target Telephone 1** the following text message: "Brother I got a move for the blue suit
in da town I nee 100 fresh ones I got hell of them but they need to be straightened out
again cause the wrinkle." Based on my training and experience, I believe that the phrase
"blue suit" (possibly a mistyping of "blue shit") is likely a reference to oxycodone
tablets, which are often referred to as "blues." I also believe that BARNETT may have
been asking for 100 "fresh" oxycodone tablets because the counterfeit oxycodone tablets
that BARNETT had ("I got hell of them") did not look legitimate ("need to be
straightened out again cause the wrinkle"). I know that it is common for counterfeit pills

29

to have discolorations or other flaws that cause the pills to look different when they are supposed to appear uniformly the same, which decreases their value.

### *In April and May 2019, DEA is authorized to intercept wire and electronic communications to and from Target Telephone 1 used by Jamaine BARNES*

89. On April 17, 2019, the Honorable Morrison C. England, Jr., signed an order authorizing the DEA to intercept wire and electronic communications to and from **Target Telephone 1**, which is used by Jamaine BARNES (2:19-SW-0315-MCE (E.D. Cal.)).

90. On May 1, 2019, at approximately 9:47AM, Jamaine BARNES paid his phone bill for **Target Telephone 1** by calling T-Mobile. During this intercepted call, the customer service representative (CSR) asked for the caller's (Jamaine BARNES') telephone number. Jamaine BARNES responded, "5593304452" (which corresponds with **Target Telephone 1**). The CSR then asked with whom the CSR was speaking and Jamaine BARNES responded, "Jamaine Barnes." I believe that this intercepted call confirms that Jamaine BARNES is the user of **Target Telephone 1**.

91. On May 1, 2019, at approximately 1:42PM, Jamaine BARNES made an outgoing call to 916-708-9806, subscribed to TRACFONE WIRELESS, INC. During this intercepted call, an unidentified male (UM9806) asked for Jamaine BARNES' e-mail address. Jamaine BARNES responded, "jamaineb01@gmail.com." At approximately 2:13PM, Jamaine BARNES sent a text message to UM9806 which stated, "Jamaineb01@gmail.com." This intercepted call and text message further corroborates that Jamaine BARNES is the user of e-mail address jamaineb01@gmail.com.

92. On May 10, 2019, at approximately 10:28PM, Jamaine BARNES made an outgoing call to 833-338-0302 and reached a recorded greeting for a business self-identified as Hotel Tonight. The majority of this call was minimized, but during a spot check Jamaine BARNES gave the CSR his e-mail address by stating, "no it's it's top it's topdolla." Jamaine BARNES then spelled out the following portion of his e-mail address, "topdolla1237" and then stated, "@gmail.com." The CSR then asked for confirmation of the caller's mobile number, and Jamaine BARNES stated, "5593304452." This intercepted call further corroborates that Jamaine BARNES is the user of e-mail address topdolla1237@gmail.com.

***Agents Identify 1139 Parma Road as a Suspected Pill Press and/or Stash House
Location Used by Jamaine BARNES, Vincent PATTERSON, and Kadrena WATTS
based on Intercepted Calls and Texts***

93.  On April 19, 2019, at approximately 7:14PM, Jamaine BARNES made an outgoing call
     on **Target Telephone 1** to telephone number 925-750-3451, used by Kadrena WATTS.[7]
     During this intercepted call, Jamaine BARNES instructed WATTS to "put one together."
     WATTS then asked, "you need put one together?" Jamaine BARNES responded, "yep,
     just one." WATTS agreed, and then Jamaine BARNES stated that he would "be there
     right now."

94.  At approximately 8:00PM, the authorized tracking device (2:19-SW-319-KJN) on the
     2014 silver Buick LaCrosse (8ECW699) known to be driven by Jamaine BARNES
     indicated that the vehicle was parked in front of the residence located at 1139 Parma
     Road, Stockton, CA.

95.  Based on this intercepted call and the subsequent vehicle tracking device information, I
     believe that Jamaine BARNES likely picked up counterfeit pharmaceutical tablets or
     purported MDMA tablets from WATTS at the 1139 Parma Road location. As detailed
     further below, based on subsequent intercepted calls and surveillance observations, I
     believe that 1139 Parma Road is a stash house and/or pill press location used for the
     manufacturing of counterfeit pharmaceutical tablets and/or purported MDMA tablets.

96.  On April 20, 2019, at approximately 5:12PM, **Target Telephone 1** received an incoming
     call from 925-522-6772, used by Vincent PATTERSON.[8] During this intercepted call,
     PATTERSON stated, "half the bucket's gone...they smackers but they ain't smacking
     like that." Jamaine BARNES responded, "unless they complain I mean, we'll have it by
     the time they complain...to switch it." I know from my training and experience that the
     term "smackers" is often used by drug traffickers as slang or code for ecstasy (MDMA)

---

[7] As described below, agents observed Kadrena WATTS answer a ghost call placed by
law enforcement to 925-750-3451 on May 4, 2019, while she was standing outside the
1139 Parma Road residence. In addition, a query of a money remitter service database
indicated that Kadrena WATTS listed telephone number 925-750-3451 on a wire transfer
through MoneyGram dated March 10, 2019 which also notated WATTS' California
Driver License B7442876 as her ID number. A social media query also indicated that
Kadrena WATTS (Kadrena Watts) was a Facebook friend of Jamaine BARNES (Jamaine
Daboss).

[8] As described below, agents observed Vincent PATTERSON answer two ghost calls
placed by law enforcement to 925-522-6772 on April 29, 2019, while PATTERSON was
standing outside Jamaine BARNES studio at 4410 N. Pershing Ave.

tablets, a Schedule 1 controlled substance. I also know from my experience in this investigation that the Jamaine BARNES DTO has distributed apparent MDMA tablets on several occasions, as described in this affidavit, but the tablets have later been found to contain other controlled substances, usually methamphetamine.

97. Subsequent to this intercepted call, at approximately 6:42PM, surveillance observed the Buick (8ECW699) known to be driven by Jamaine BARNES parked on the street in front of the residence located at 1139 Parma Road, Stockton, CA. At approximately 6:50PM, surveillance observed Jamaine BARNES exit the front door of the residence located at 1139 Parma Road and depart the area driving the Buick.

98. At approximately 7:08PM, Jamaine BARNES received another incoming call from PATTERSON. During this intercepted call, PATTERSON stated, "these motherfuckers starting to come out soft." Jamaine BARNES responded, "alright, alright, alright, I know what to do." PATTERSON responded, "alright."

99. At approximately 7:30PM, Jamaine BARNES called PATTERSON. During this intercepted call, Jamaine BARNES asked, "how much is left?" PATTERSON responded, "maybe like couple hundred."

100. At approximately 7:45PM, surveillance observed Jamaine BARNES' Buick (8ECW699) parked partially in the driveway of the 1139 Parma Road location. Also parked on the street near the 1139 Parma Road residence was a Hyundai vehicle bearing CA license plate number 6MIR002 registered to Kyadijah GOODMAN, 2032 Black Rose Ln, Stockton, CA according to the DMV. Agents also discovered that Kadrena WATTS (subscriber and user of telephone 925-750-3451) lists 2032 Black Rose Ln, Stockton, CA as her address with the DMV, which is also the subscriber address for her telephone number.

101. Based on these intercepted calls, I believe that PATTERSON is conspiring with Jamaine BARNES to manufacture, distribute, and possess with the intent to manufacture and distribute purported ecstasy (MDMA) tablets. I believe that PATTERSON was calling Jamaine BARNES from a potential stash and/or pill press location ("half the bucket's gone") overseen by Jamaine BARNES. I further believe that in the first intercepted call, PATTERSON was indicating that the potency of the tablets ("smackers") was low ("but they ain't smacking like that") and that Jamaine BARNES in turn indicated that they will have time to make the tablets more potent with stronger ingredients by the time the customers start complaining ("we'll have it by the time they complain … to switch it"). I further believe that in the second intercepted call, PATTERSON was alerting Jamaine BARNES that the consistency of the tablets being pressed was soft ("these motherfuckers

32

starting to come out soft") and that Jamaine BARNES responded that he knows how to fix the problem ("alright, I know what to do"). I further believe that in the third intercepted call ("how much is left?") Jamaine BARNES was trying to ascertain either (a) how many of the tablets were remaining at the potential stash and/or pill press location or (b) how many tablets were left to be pressed. I believe that PATTERSON's response ("maybe like couple hundred") indicated either (a) that there were still approximately two hundred tablets remaining at the location or (b) that there were approximately two hundred tablets remaining to be pressed. I believe that the content of these calls indicates that Jamaine BARNES is overseeing the manufacturing of purported MDMA tablets and that PATTERSON is conspiring with Jamaine BARNES to manufacture and distribute the tablets.

102. At approximately 7:52PM on the same day, April 20, 2019, Jamaine BARNES made an outgoing call on **Target Telephone 1** to 209-490-9635, subscribed to and used by Jamar BARNES. During this intercepted call, Jamaine BARNES stated, "(unintelligible) … Kadrena." Jamar BARNES responded, "mother fucker, why you tell me you're going to the fuckin' studio when you're going way over there?" Jamaine BARNES responded, "bitch cause I was over here doing it what the fuck you talking about?" Jamar BARNES then indicated that he thought Jamaine BARNES was going to the studio (Pershing). Then Jamaine BARNES stated, "the mother fuckers started going soft on me, it tore up 30 fuckin' minutes of my time."

103. Based on this intercepted call, I believe that Jamaine BARNES is involved in the production of purported MDMA tablets ("bitch cause I was over here doing it"). I further believe, based in part on the foregoing, that PATTERSON and WATTS are involved in manufacturing the tablets at the 1139 Parma Road location.

104. On April 22, 2019, at approximately 5:34PM, Jamaine BARNES made an outgoing call on **Target Telephone 1** to 510-753-0973 (subscriber unknown) during which an unidentified male (UM0973) stated, "my little cousin uh … they got somebody that wanna get two boats." Jamaine BARNES then asked, "smackers?" UM0973 then confirmed, "yeah." Jamaine BARNES then asked when they wanted them, and UM0973 responded as soon as possible. Jamaine BARNES then stated, "alright, I get them right now." UM0973 then asked, "alright how much?" Jamaine BARNES responded, "(unintelligible) for two."

105. At approximately 5:46PM, Jamaine BARNES made an outgoing call to UM0973 during which Jamaine BARNES stated, "two boats … tell em you want two bens, a dime apiece … and I curb your bill … and I give you a hundred put in your pocket." UM0973 then agreed.

106. At approximately 9:08PM, Jamaine BARNES received an incoming call from UM0973 during which UM0973 stated that his "cousin" was 45 minutes away.

107. At approximately 9:10PM, Jamaine BARNES made an outgoing call on **Target Telephone 1** to WATTS (925-750-3451) and stated, "Imma pull up." WATTS responded, "alright."

108. At approximately 9:15PM, Jamaine BARNES received an incoming call from UM0973 during which UM0973 stated that "they're 20 minutes away."

109. Shortly thereafter, at approximately 9:39PM, surveillance observed the Buick (8ECW699) known to be driven by Jamaine BARNES parked on the street one house west of 1139 Parma Road, the suspected stash and/or pill press location where WATTS is believed to have been, based on the 9:10 PM intercepted call and prior transaction patterns detailed above.

110. Based on these calls, I believe that UM0973 ordered 2,000 ("two boats") of purported MDMA pills ("smackers") from Jamaine BARNES and that WATTS was present at 1139 Parma Road when Jamaine BARNES stopped by the house to pick up the 2,000 purported MDMA pills to deliver to UM0973.

111. On April 26, 2019, at approximately 12:51PM, Jamaine BARNES made an outgoing call on **Target Telephone 1** to WATTS (925-750-3451). During this call, Jamaine BARNES told WATTS that he was going to call her in a little bit because he was going to need her since his "other shit will be here next week, they just (unintelligible) the tracking number."

112. Based on this intercepted call (and the calls detailed in the following subparagraphs below), I believe that Jamaine BARNES was putting WATTS on notice to be ready to start producing counterfeit pharmaceutical pills again since his new equipment would be arriving the next week:

    i.   At approximately 3:06PM on April 26, 2019, Jamaine BARNES (**Target Telephone 1**) received an incoming call from 559-977-7926 (subscribed to PREPAID CUSTOMER). During this call, an unidentified male (UM7926) asked, "you got another press?" Jamaine BARNES responded, "no." Jamaine BARNES later stated, "but this week." Later in the conversation, Jamaine BARNES stated, "I got the new faces and everything but I'm just waiting for the wheel to come in." Later, Jamaine BARNES stated, "I got another one it's a

34

whole different face on that mother fucker, but it just OC." UM7926 then asked, "like a OxyContin or something?" Jamaine BARNES responded, "no it don't say OxyContin it just say OC on it." Jamaine BARNES later stated, "it's just a stamp, they just put two letters on it." UM7926 then asked, "what color is it?" Jamaine BARNES responded, "we can make em different colors." UM72926 later asked, "when the other presses come?" Jamaine BARNES responded, "they already here, I'm waiting on a wheel right now, I'm waiting on wheel to come." Based on this intercepted call, I believe Jamaine BARNES is indicating to UM7926 that he (Jamaine BARNES) is waiting for a pill press part to arrive, specifically a wheel, before he can start producing counterfeit pharmaceutical tablets again, to include different colored pills with an "OC" stamped logo.

ii.    At approximately 4:27PM on April 26, 2019, Jamaine BARNES (**Target Telephone 1**) received an incoming call from 650-385-1346, subscribed to and used by Darrell SNOWDEN. During this call, SNOWDEN asked, "when you gonna have some em ahh new, new Norcs?" Jamaine BARNES responded, "the piece come this week, I just got the confirm ... the tracking number." Jamaine BARNES later stated, "there's two little pins I needed." Based on this intercepted call, agents believe that SNOWDEN was asking when Jamaine BARNES was going to start producing counterfeit pharmaceutical tablets again ("Norcs") and Jamaine BARNES indicated that he was waiting on pill press parts ("two little pins") to arrive this week.

iii.   On April 27, 2019, at approximately 7:19PM, Jamaine BARNES (**Target Telephone 1**) made an outgoing call to 510-701-1799, subscribed to Taliesha WILLIAMS and used by an unidentified male (UM1799). During this call, Jamaine BARNES stated, "everything be here on Tuesday, it's gonna be back on baby." UM1799 responded, "it's all good, I got a nigger want like five six hundred percs, on deck." Jamaine BARNES responded, "say no mo nigga." Based on this intercepted call, I believe that Jamaine BARNES was informing UM1799 that the pill press parts would arrive on Tuesday ("everything be here on Tuesday") and that production of counterfeit pharmaceutical tablets would resume ("it's gonna be back on baby"). I further believe that UM1799 has a buyer arranged for 500 or 600 counterfeit Percocet tablets ("five six hundred percs").

113.   On April 30, 2019, at approximately 9:30PM, Jamaine BARNES made an outgoing call to WATTS. During this intercepted call, Jamaine BARNES stated, "hey I need one nigga." WATTS then asked, "when?" Jamaine BARNES responded, "right now, like fifteen, twenty minutes." WATTS responded, "alright nigga hurry up." Jamaine BARNES responded, I'm on my way right now."

35

114. At approximately 10:02PM, Jamaine BARNES made another outgoing call to WATTS. During this intercepted call, Jamaine BARNES stated, "bring me the bag," and then stated, "I'm pulling up right now." WATTS responded, "alright."

115. Based on my training and experience with this investigation, I believe that Jamaine BARNES was instructing WATTS to get 1,000 ("one" "bag") purported MDMA pills ready for him to pick up.

116. Authorized GPS pings on Jamaine BARNES', WATTS', and PATTERSON's phones indicated that all three individuals were in the vicinity of 1139 Parma Road (the suspected stash/pill press location) during the same time period following the aforementioned calls on April 30, 2019. At approximately 10:10PM and 10:24PM, the ping on **Target Telephone 1** indicated that Jamaine BARNES was in the area of 1139 Parma Road with an accuracy radius of 2,070 meters. At approximately 10:06PM and 10:20PM, the ping on WATTS's phone indicated that she was also in the area of 1139 Parma Road with an accuracy radius of 2,070 meters. At approximately 10:32PM, the ping on PATTERSON's phone indicated that he was also in the area of 1139 Parma Road with an accuracy radius of 2,070 meters.

117. On May 4, 2019, at approximately 2:40PM, surveillance observed a dark grey Dodge Durango depart 1139 Parma Road and travel to a shopping center located on Manthey Road south of Carolyn Weston Blvd in Stockton. Surveillance then observed the vehicle park at the gas pumps located at the north end of the parking lot. Surveillance then observed the driver get out of the vehicle and subsequently identified her as Kadrena WATTS. Surveillance also observed the license plate on the vehicle to be 7CEP591, which according to CA DMV is registered to Kadrena WATTS, 2032 Black Rose Ln, Stockton, CA 95206. At approximately 3:13PM, surveillance observed WATTS arrive back at 1139 Parma Road in the Durango. At approximately 3:17PM, the authorized GPS ping (2:19-SW-0367 AC) on WATTS telephone (925-750-3451) indicated that WATTS was in the vicinity of 1139 Parma Road with an accuracy radius of 3,339 meters. At approximately 7:17PM, California Highway Patrol (CHP) surveillance Agent A. Chan placed a ghost call to WATTS' telephone number 925-750-3451 while observing WATTS outside in front of 1139 Parma Road. CHP Agent Chan then observed WATTS answer the phone at the same time that he made the call and put the phone down when the call ended. It was an approximately 5-6 second call. At the same time as the ghost call (7:17PM), the authorized GPS ping on WATTS' phone indicated that WATTS was in the vicinity of 1139 Parma Road with an accuracy radius of 3,339 meters.

36

118. A subpoena response from PG&E indicated that the utilities subscriber at 1139 Parma Road as of May 2019 was Kyadijah GOODMAN. As previously detailed, surveillance has observed a Hyundai vehicle bearing CA license plate number 6MIR002 registered to Kyadijah GOODMAN, 2032 Black Rose Ln, Stockton, CA parked on the street near the 1139 Parma Road residence. Agents also discovered that Kadrena WATTS lists 2032 Black Rose Ln, Stockton, CA as her address with the DMV, which is also the subscriber address for her telephone number.

119. Agents obtained subscriber information for telephone number 925-522-6772 (Vincent PATTERSON) and found that it listed Deramisha D King, 1522 Julian St, Stockton, CA as the subscriber. According to California DMV records, Deramisha D King is a 23-year old female and lists 1522 Julian St, Stockton, CA as her address on her California driver's license. However, the voice of the user of telephone number 925-522-6772 appeared to belong to a male. I know through my training and experience that drug traffickers often use phones subscribed using false names and addresses or in the names and addresses of nominees as a method to avoid detection. According to toll records, during the period of January 12, 2019 to April 21, 2019, there were approximately 185 phone calls between PATTERSON and **Target Telephone 1**.

120. On April 29, 2019, at approximately 10:00AM, surveillance Agents from the San Joaquin County Metropolitan Narcotics Task Force (METRO) observed a silver Lincoln (CA license plate number 6CQP793) parked on the street just to the east of 22 W. Willow Street, Stockton, CA. At approximately 10:20AM, surveillance observed PATTERSON get into the driver's seat of the Lincoln and depart driving west on W. Willow Street. Surveillance then observed PATTERSON arrive at 4410 N. Pershing Avenue in Stockton and enter unit C-24, which is known to be the location of Jamaine BARNES' recording studio. At approximately 10:45AM, the authorized GPS ping (2:19-SW-345 CKD) on PATTERSON's telephone (925-522-6772) indicated that PATTERSON was in the area of the studio at 4410 N. Pershing Ave, with an accuracy radius of 1,281 meters. At approximately the same time (10:45AM), while PATTERSON was standing outside of the studio, METRO Agent Neto Urias placed a ghost call to PATTERSON's telephone number 925-522-6772. METRO Agent Leo Conn then observed PATTERSON put a phone up to his (PATTERSON's) right ear at the same time that the ghost call was placed. A second ghost call was then placed by METRO Agent Urias to 925-522-6772 and once again METRO Agent Conn observed PATTERSON simultaneously put a phone to his (PATTERSON's) ear. On both occasions when the ghost calls were terminated, METRO Agent Conn observed PATTERSON pull the phone from his (PATTERSON's) ear and look at the phone. METRO Agent Caleb Lind later accessed the social media website "Instagram" and located a photo of several individuals together including Jamaine BARNES and PATTERSON; the name tagged under the photo was "vince_p."

37

METRO Agent Lind clicked on the name "vince_p" and opened the subject's account. Upon opening the account, METRO Agent Lind observed the subject's full name listed as "Vincent Patterson." METRO Agent Lind then positively identified PATTERSON based on a comparison to PATTERSON's CA driver's license photograph.

121. On May 11, 2019, at approximately 4:04AM, the authorized GPS ping on PATTERSON's phone indicated that he was in the area of 32 W. Willow Street, Stockton, CA with an accuracy radius of 1,281 meters. At approximately 8:00AM, surveillance was established at 32 W. Willow Street, Stockton, CA in order to confirm the residence of PATTERSON. It should be noted that 32 W. Willow Street is part of a tri-plex comprised of the addresses 30, 32 and 34 W. Willow Street. At approximately 8:03AM, the authorized GPS ping on PATTERSON's phone indicated that he was still in the area of 32 W. Willow Street with an accuracy radius of 3,339 meters. At approximately 9:55AM, surveillance observed PATTERSON walk out from the driveway of the tri-plex. Surveillance then observed PATTERSON walk back and forth to the driveway area multiple times. At approximately 10:48AM, the authorized GPS ping on PATTERSON's phone indicated that he was still in the area of 32 W. Willow Street with an accuracy radius of 1,281 meters. At approximately 11:00AM, surveillance observed PATTERSON exit the north facing door at 32 W. Willow Street and depart in a white Hyundai bearing CA license plate number 5HCK669 registered to Bria Symone MCDANIELS, 8589 West Wing Dr, Elk Grove, CA 95758.Surveillance was maintained on the Hyundai until it arrived at 4410 N. Pershing Ave, which is the location of Jamaine BARNES's studio. At approximately 11:18AM, the authorized GPS ping on PATTERSON's phone indicated that he was in the area of 4410 N. Pershing Ave and 32 W. Willow St (due to the close proximity of the two locations) with an accuracy radius of 3,339 meters. However, it should be noted that the earlier ping at 10:48AM was only within the proximity of 32 W. Willow St and not 4410 N. Pershing Ave, so the later ping at 11:18AM corroborated surveillance observations by verifying that PATTERSON had moved away from 32 W. Willow St in the direction of 4410 N. Pershing Ave. Later that night, at approximately 11:48PM, the authorized GPS ping on PATTERSON's phone indicated that he was in the area of 32 W. Willow Street with an accuracy radius of 3,339 meters.

122. The authorized GPS pings on PATTERSON's phone for April 23, 2019 through the date of this affidavit show that his phone is generally in the area of 32 W. Willow Street during nighttime hours, with an accuracy generally ranging from approximately 1,281 to 3,339 meters.

38

123. A subpoena response from PG&E indicated that the utilities subscriber at 32 W. Willow Street as of April 2019 was Deramisha KING, which matches the subscriber name on PATTERSON's phone.

***Intercepted calls beginning on April 25, 2019 between Jamaine BARNES and Chevele "Flipp" RICHARDSON regarding purported MDMA transactions; Agents identify 411 S. Stanislaus St, Apt J205, Stockton, as RICHARDSON's Residence***

124. On April 23, at approximately 9:13PM, Jamaine BARNES placed an outgoing call to 510-689-4447, subscribed to "Flipp RICHARDSON" and used by Chevele RICHARDSON. During this intercepted call, Jamaine BARNES asked, "what you working with?" RICHARDSON responded, "that girl scout." Jamaine BARNES responded, "alright let me get a hit of that." RICHARDSON then responded, "alright it's good, call me when you uhh, (unintelligible) the phone come over here." Jamaine BARNES responded, "I'll be there in three minutes." RICHARDSON responded, "alright … about to get it ready now."

125. Based on this intercepted call, I believe that Jamaine BARNES was arranging to purchase marijuana (most likely a user quantity) from RICHARDSON. I know that there is a particular strain of marijuana that is known as "Girl Scout Cookies."

126. At approximately 9:18PM, Jamaine BARNES place another outgoing call to RICHARDSON. During this intercepted call, Jamaine BARNES stated, "I'm here." RICHARDSON responded, "alright I'm coming out right now."

127. At approximately 9:19PM, surveillance observed Jamaine BARNES' Buick arrive and stop near the intersection of S. Stanislaus Street and E. Sonora Street in Stockton, CA. It should be noted that the subscriber address for RICHARDSON's phone number is 411 S. Stanislaus St, Apt J205, Stockton, CA 95203, which is located across the street from the intersection where Jamaine BARNES' Buick had just stopped, as shown below.



128. At approximately 9:25PM, surveillance observed RICHARDSON walking away from Jamaine BARNES' Buick and entering another vehicle described as a red Mitsubishi bearing CA license plate number 7USJ305. DEA TFO Aaron Kacalek positively identified RICHARDSON based on a comparison to RICHARDSON's CA DMV photo. A subsequent CA DMV check on the vehicle RICHARDSON entered revealed that it was a 2012 Mitsubishi registered to Chevele Bernard RICHARDSON, 411 S. Stanislaus St., Apt J205, Stockton, CA 95203. Prior to departing, TFO Kacalek observed Jamaine BARNES honk and wave to RICHARDSON and then drive away.

129. On April 25, 2019, at approximately 2:19PM, Jamaine BARNES received an incoming call from RICHARDSON. During this call, RICHARDSON asked, "what kind of things you got right now?" Jamaine BARNES responded, "some scorpions." Jamaine BARNES then asked how many RICHARDSON needed and RICHARDSON responded, "200"; Jamaine BARNES responded that he would pick some more up. RICHARSON then asked, "what color are they?" and Jamaine BARNES responded, "red."

130. Based on this intercepted call, I believe that RICHARDSON was inquiring as to what kind of purported MDMA pills ("red" "scorpions") Jamaine BARNES had available to sell because RICHARSON needed to purchase two hundred pills ("200"). I know that MDMA pills are produced in various colors with different types of logos (such as red scorpions) stamped on them.

40

131. On April 26, 2019, at approximately 2:34PM, Jamaine BARNES received an incoming call from RICHARDSON. During this intercepted call, Jamaine BARNES stated, "shit I might be moving in one second the police is kinda hot around here I can't move 'em outta here yet." RICHARDSON acknowledged and then agreed to meet with Jamaine BARNES later at the studio (4410 N. Pershing Ave). Jamaine BARNES further explained that there was an increased police presence in the Weston Ranch ("the ranch") area of Stockton due to a shooting and that he was having difficulty moving "all this shit" so that he could meet RICHARDSON at the "studio." It should be noted that several locations associated with Jamaine BARNES are located within the Weston Ranch area of Stockton, to include 2518 Briarcliff Drive and 4420 Janell Lane.

132. Based on this intercepted call, I believe that Jamaine BARNES was trying to move purported MDMA tablets ("all this shit") from one of his associated locations in the Weston Ranch area of Stockton to his studio located at 4410 N. Pershing but was unable to due to an increased police presence in the area caused by an unrelated incident. I further believe that Jamaine BARNES was informing RICHARDSON that as soon as the purported MDMA tablets were moved to the studio Jamaine BARNES could distribute them to RICHARDSON at the studio.

133. On April 27, 2019, at approximately 11:29 a.m., Jamaine BARNES received an incoming call from RICHARDSON. During this call, RICHARDSON asked, "ain't no more them scorpions?" Jamaine BARNES responded, "yeah some over there." RICHARDSON responded, "oh ok I thought you was bringing me some of them, these the same one." Jamaine BARNES stated, "there's some at the studio."

134. Based on this intercepted call, I believe that Jamaine BARNES supplied RICHARDSON with MDMA pills (per the intercepted calls on April 25 & 26, 2019) and that RICHARDSON did not get the right pills that he (RICHARDSON) ordered ("scorpions").

135. On May 5, 2019, at approximately 6:10PM, Jamaine BARNES made an outgoing call to RICHARDSON. During this intercepted call, RICHARDSON stated, "that's why I didn't hit you for that half yet." RICHARDSON later stated, "I still got you though." Jamaine BARNES later stated, "I forgot about that." RICHARDSON later stated, "yeah I got you though, it's been ugly, niggas giving the nigga the run around right now." Jamaine BARNES then responded, "alright."

136. Based on this intercepted call, I believe that RICHARDSON was indicating that he still owed Jamaine BARNES for 500 fronted purported MDMA pills ("I still got you", "for

41

that half") and the reason RICHARDSON hadn't paid the drug debt yet was because RICHARDSON hadn't been able to collect the drug proceeds yet from selling the pills ("been ugly", "niggas giving the nigga the run around right now").

### *April 26, 2019 arrest of Tashawn DICKERSON with a large number of purported MDMA pills containing methamphetamine supplied by Jamaine BARNES*

137. On Tuesday, April 23, 2019, at approximately 7:18PM, Jamaine BARNES made an outgoing call on **Target Telephone 1** to 209-550-1567, subscribed to Krystyne MAHURIN and used by Tashawn DICKERSON, during which DICKERSON stated that he needed to "grab one" tomorrow and ride down south with it, and then "shoot ... the dough" to Jamaine BARNES the next day. Jamaine BARNES agreed and they arranged for DICKERSON to pick it up the next day after DICKERSON got off of work at 4:00.

138. Based on this intercepted call, I believe that DICKERSON arranged for Jamaine BARNES to front ("shoot you the dough on Thursday") 1,000 pills ("one") to DICKERSON. However, subsequent intercepted telephone calls and text messages indicated that this transaction was delayed.

139. On April 26, 2019, at approximately 7:40PM, surveillance observed Jamaine BARNES arrive at 1139 Parma Road, Stockton, CA, and walk up to the house with another individual.

140. At approximately 8:02PM, Jamaine BARNES received an incoming call from DICKERSON. During this call, Jamaine BARNES told DICKERSON, "I'm finishing right now" and then directed DICKERSON to meet him (Jamaine BARNES) at the gas station off the freeway at "French Camp."

141. At approximately 9:09PM, surveillance identified DICKERSON waiting in the 76 gas station parking lot located off of the French Camp I-5 exit. Surveillance observed that DICKERSON was next to his silver 2002 Honda Accord bearing CA license plate number 4VBV726 (registered to Tashawn T DICKERSON).

142. At approximately 9:33PM, Jamaine BARNES made an outgoing call to DICKERSON. During this call, Jamaine BARNES stated that he was cleaning up and was about to "pull up" on DICKERSON.

143. Based on these intercepted calls, I believe DICKERSON and Jamaine BARNES arranged to meet for Jamaine BARNES to front 1,000 pills to DICKERSON.

144. At approximately 9:48PM, Jamaine BARNES made an outgoing call to 702-238-8253, subscribed to Kavid WILEY and used by Kavieo WILEY.[9]  During this intercepted call, Jamaine BARNES stated, "I need you jump in car with him, bring me 76 gas station, cause need you go me."  WILEY asked, "damn bro, alright, who comin' to get me?"  Jamaine BARNES later responded, "you gonna ride over here with him."  WILEY then asked, "with who?"  Jamaine BARNES responded unintelligibly, and later asked, "did (unintelligible) pull up?"  WILEY responded, "no nobody pulled up yet."

145. Based on this intercepted call, I believe that Jamaine BARNES was directing WILEY to get a ride over to 1139 Parma Road ("you gonna ride over here with him") and assist Jamaine BARNES in delivering the pills to DICKERSON ("I need you jump in car with him, bring me 76 gas station, cause need you go me").

146. At approximately 9:56PM, surveillance observed two subjects come from the 1139 Parma Road location and depart in a blue Dodge Durango, bearing California license plate number 5HAY528.  At approximately 10:00PM, surveillance observed the blue Dodge Durango quickly meet with DICKERSON in the 76 gas station parking lot off of the French Camp I-5 freeway exit located at 5777 S French Camp Road, French Camp, CA.  Surveillance observed a quick exchange between the occupants of the Durango and DICKERSON.  Surveillance then observed DICKERSON briefly access the trunk of his Honda.  Immediately thereafter, the Honda departed the gas station heading south on I-5.

147. At approximately 10:18PM, a CHP officer patrolling in a marked unit observed DICKERSON's vehicle southbound on Highway 99 just south of Jack Tone Road.  Shortly thereafter, the CHP officer initiated a traffic stop on the Honda for a traffic violation; the Honda yielded to the right shoulder of Hammett Road just west of Highway 99.  The driver and sole occupant of the Honda was then identified as Tashawn DICKERSON, and the CHP officer learned that DICKERSON did not have proof of insurance for the vehicle.  A subsequent positive alert by a K-9 on the vehicle led to a search of the vehicle.  During the search, CHP found and seized a plastic bag containing a large number of suspected MDMA pills (pictured below), weighing approximately one pound (451.3 grams net weight), from a duffle bag in the trunk of the vehicle.  DICKERSON was then arrested and the pills were seized pursuant to local charges.  The pills were subsequently tested at a DEA lab and found to contain methamphetamine.

---

[9] As described in detail below, WILEY provided this phone number to CS-3 on May 9, 2019, when CS-3 purchased approximately 1,000 purported MDMA pills containing methamphetamine from him at the studio at 4410 N. Pershing Avenue, #C-24.



148. Based on the aforementioned calls, surveillance observations, and law enforcement actions, I believe that Jamaine BARNES supplied the seized tablets to DICKERSON.

149. The next day, April 27, 2019, at approximately 9:34AM, Jamaine BARNES made an outgoing call to DICKERSON which did not connect. I believe that Jamaine BARNES was attempting to contact DICKERSON to collect the money for the pills Jamaine BARNES had fronted to DICKERSON the night before.

150. On May 2, 2019, at approximately 1:54PM, Jamaine BARNES received an incoming call on **Target Telephone 1** from DICKERSON (209-550-1567). During this intercepted call, Jamaine BARNES asked, "what's up fool, what happened?" DICKERSON indicated that he would call back from his girlfriend's number, and then stated, "I'll probably meet up with you tomorrow and shoot you some."

151. At approximately 2:18PM, Jamaine BARNES received an incoming text message from telephone number 209-380-1474 which stated, "this td this my girls phone."

152. At approximately 2:48PM, Jamaine BARNES received an incoming call from telephone number 209-380-1474. During this intercepted call, DICKERSON talked about his arrest and made the following statements, "pulled me over," "I didn't have no insurance card on me," "brought the dog out, sniffing it," "started ripping through my trunk and shit and pulled out a bag I never seen," "man that ain't mine nigga, I do Lyft, you know what I'm saying," "but yeah, just just be cool on that number, ya' know what I mean, switch your

44

shit up," "but yeah, Imma link up with you tomorrow and shoot you something bro." Jamaine BARNES responded, "alright."

153. Based on this intercepted call, I believe that DICKERSON was indicating that he would be paying Jamaine BARNES the money he owed him ("shoot you something"). I also believe that DICKERSON was warning Jamaine BARNES to change his phone number ("just be cool on that number," "switch your shit up") due to DICKERSON's arrest and seizure of pills supplied by Jamaine BARNES.

154. A query of a money remitter database indicated that 209-550-1567 was listed as the telephone number for Tashawn DICKERSON, receiving wire transfers of funds during August, September and December 2018.

### *April 28, 2019 Intercepted Call Between Jamaine BARNES and THOMPSON*

155. On April 28, 2019, at approximately 4:14PM, Jamaine BARNES made an outgoing call to 209-426-1166 subscribed to and used by Johnesha THOMPSON. It should be noted that this is the same telephone number which was utilized by THOMPSON at the time of her arrest in Arizona as previously detailed. During this intercepted call, Jamaine BARNES was organizing a music video shoot at the last minute and he was running late, and THOMPSON stated, "you can't be like this in the music, with the other shit you can but not with the music." Based on this intercepted call and THOMPSON's prior involvement in Jamaine BARNES drug trafficking operations, I believe that THOMPSON was indicating that it was alright for Jamaine BARNES to be less timely while engaged in drug trafficking activities ("the other shit") as opposed to the music business where punctuality is expected. I believe that this intercepted call further corroborates that THOMPSON was previously involved in Jamaine BARNES' drug trafficking operations.

### *Agents Identify 723 Bedlow Dr as Jamar BARNES' Residence and Another Pill Press Location Used by Jamaine BARNES, Jamar BARNES, Vincent PATTERSON, and Alexander WELCH*

156. On May 4, 2019, at approximately 9:43 a.m., Jamaine BARNES (**Target Telephone 1**) received an incoming text message from 209-898-9662, used by WELCH,[10] which stated, "Bro we here." At approximately 9:49 p.m., the authorized GPS ping on WELCH's

---

[10] As described below, agents observed Alexander WELCH answer a ghost call placed by law enforcement to 209-898-9662 on April 20, 2019.

telephone (2:19-SW-344 KJN) indicated that WELCH was in southern California, approximately 17 miles north of Los Angeles.

157. Later that day, at approximately 7:16 p.m., Jamaine BARNES received an incoming call from 209-898-9662, used by WELCH. During this intercepted conversation, WELCH asked, "did Vince already give you the money?" Jamaine BARNES responded, "no he didn't give me nothin'." WELCH acknowledged and then asked, "what I owe you 22 or 23?" Jamaine BARNES then asked, "what you talkin' about?" WELCH then responded, "for the 30." Jamaine BARNES responded, "I'll call you when I get there bruh let me finish this right quick." WELCH then agreed. At approximately 7:18 p.m., the authorized GPS ping on WELCH's telephone indicated that WELCH was still in approximately the same area of southern California.

158. I believe that WELCH traveled to southern California on behalf of Jamaine BARNES ("Bro we here") in the furtherance of Jamaine BARNES' drug trafficking operations and that WELCH subsequently inquired with Jamaine BARNES in regards to an outstanding drug debt ("what I owe you 22 or 23"; "for the 30").

159. On May 5, 2019, at approximately 9:18AM, the authorized GPS ping on WELCH's phone indicated that he was still in the same general area north of Los Angeles. At approximately 9:33AM, the authorized GPS ping on WELCH's phone indicated that he began traveling northbound away from Los Angeles.

160. On May 5, 2019, at approximately 11:07 a.m., Jamaine BARNES made an outgoing call to telephone number 209-490-9635, subscribed to and used by Jamar BARNES (the twin brother of Jamaine BARNES). During this intercepted call, Jamaine BARNES stated, "(unintelligible) put the OC in." Jamaine BARNES later stated, "start doin' it brother, we got business, we ain't got to be playin', can't be playin' right now." Jamar BARNES then stated, "I need, I need two of 'em." Jamaine BARNES then interrupted and stated, "brother would you go start puttin' the thang on and stop talkin'?" Jamar BARNES later stated again, "I need two of 'em fool (unintelligible)." Jamaine BARNES then interrupted and reiterated, "I know that brother, can you do that put it on so we can (unintelligible) the prices I know what you need I got you I said that." Jamaine BARNES then stated, "(unintelligible) prices (unintelligible)." Jamar BARNES interrupted by stating, "no shit I know that." Jamar BARNES later stated, "everybody wants something different." Jamaine BARNES responded, "I know." Jamar BARNES later stated, "(unintelligible) losing more money cause we gotta keep spending money." Jamaine BARNES then stated, "alright uh go put that on right now though." Jamar BARNES responded, "ok."

46

161. Based on this intercepted call, I believe that Jamaine BARNES instructed Jamar BARNES to start manufacturing counterfeit oxycodone tablets ("put the OC in"; "start doin' it brother, we got business"). I know that the term "OC" is commonly used by counterfeit pill manufacturers and drug traffickers to refer to oxycodone, a Schedule II controlled substance. I further believe that Jamar BARNES indicated that he needs 2,000 counterfeit oxycodone tablets once the batch is finished ("I need two of 'em"). I know that 1,000 pills are often referred to as "boats" and that one or two boats are often referred to as "one" or "two." I further believe that Jamar BARNES indicated that their counterfeit pharmaceutical tablet sub-distributors and/or customers want a variety of tablets to purchase ("everybody wants something different").

162. At approximately 1:54PM on May 5, 2019, Jamaine BARNES made an outgoing call to 209-898-6679 subscribed to Charlotte SYLVA and utilized by an unidentified female (UF6679). During this intercepted call, UF6679 asked, "what you say to Jamar?" Jamaine BARNES responded in reference to something about a belt. UF6679 then asked, "Ok what about the gun?" Jamaine BARNES responded unintelligibly. UF6679 then stated, "cause I don't want (unintelligible) he probably had that fuckin' gun in my house." UF6679 later stated, "I don't want Jamar back here, he probably had that gun up in here in this house with his backpack and shit, I don't want him in my house." The subscriber address for telephone number 209-898-6679 is 4420 Janell Ln, Stockton, CA 95206, and the subscriber, Charlotte SYLVA, is believed to be Jamaine BARNES's and Jamar BARNES's mother. Charlotte SYLVA also lists her address with the DMV as "4420 Junell Ln, Stockton, CA 95206," which appears to be a slight misspelling of 4420 Janell Ln. A subpoena response from PG&E in May 2019 indicated that Charlotte SYLVA is the utilities subscriber at 4420 Janell Lane. Based on this intercepted call, I believe that Jamar BARNES may have been storing a firearm at 4420 Janell Lane. Jamar BARNES has a 2008 felony conviction for possession with intent to distribute MDMA in violation of 21 U.S.C. § 841(a)(1), making it illegal for him to possess a firearm.

163. Later on May 5, 2019, at approximately 4:04PM, the authorized GPS ping on WELCH's phone indicated that he had arrived in the immediate vicinity of 721 Bedlow Drive, Stockton, CA with an accuracy radius of 9 meters. 721 Bedlow Drive is the neighboring residence of 723 Bedlow Drive, located approximately 30 feet away, which is equivalent to approximately 9 meters. As will be shown below, 723 Bedlow Drive is the known residence of Jamar BARNES. Based on the aforementioned intercepted text message and call, coupled with GPS ping locations, I believe that WELCH traveled to southern California on behalf of Jamaine BARNES and then returned to Jamar BARNES' residence. I further believe that WELCH most likely transported something to be used in Jamaine BARNES' counterfeit pharmaceutical manufacturing operation, which will be

47

further established below based upon the events that subsequently transpire at 723 Bedlow Drive.

164. At approximately 4:18PM, the authorized GPS ping on WELCH's phone indicated that he was still in the immediate vicinity of 721 Bedlow Drive with an accuracy radius of 14 meters, which still encompasses 723 Bedlow Drive. At approximately 4:33PM, the authorized GPS ping on WELCH's phone indicated that he had traveled away from 723 Bedlow Drive. At approximately 5:33PM, the authorized GPS ping on WELCH's phone indicated that he was in the immediate vicinity of Jamaine BARNES' studio located at 4110 N. Pershing Avenue, Stockton, CA with an accuracy radius of 14 meters.

165. During the same timeframe as WELCH's movements, at approximately 4:33PM, the authorized GPS ping on Jamaine BARNES' phone indicated that he (Jamaine BARNES) was in the vicinity of his (Jamaine BARNES') studio located at 4410 N. Pershing Ave with an accuracy radius of 1,281 meters. Subsequently, the authorized GPS pings on Jamaine BARNES' phone between the periods of 5:04PM through 6:18PM indicated that he was in the vicinity of 723 Bedlow Drive with accuracy radiuses between 1,709 to 3,339 meters. Jamaine BARNES then temporarily departed the area of 723 Bedlow Drive according to the authorized GPS pings on his phone, but then later returned to the location and pinged in the vicinity again at 8:04PM with an accuracy radius of 3,339 meters.

166. At approximately 8:08 p.m., Jamaine BARNES received an incoming call from 209-490-9635, used by Jamar BARNES. During this intercepted call, Jamaine BARNES stated, "your bathroom window open." Jamar BARNES then asked, "my bathroom window open?" Jamaine BARNES responded, "I'm trying see right now." Jamar BARNES later stated, "go in my room." Jamar BARNES later stated, "and make me some shit too." Jamar BARNES later stated, "no bitch yer gonna pay me tonight bitch, fuck you."

167. Based on this intercepted call and GPS pings, I believe that Jamaine BARNES was inside of Jamar BARNES' residence at the time of the call ("go in my room"). I also believe that Jamar BARNES' residence may be a clandestine laboratory location utilized for manufacturing counterfeit pharmaceutical tablets ("make me some shit too").

168. At approximately 8:13 p.m., Jamaine BARNES made an outgoing call to the 209-490-9635, used by Jamar BARNES. During this intercepted call, Jamaine BARNES stated, "how far you away, Imma 'bout to get (unintelligible) mine (unintelligible) get jiggy." Jamar BARNES then asked, "you said what happened." Jamaine BARNES repeated, "Imma (unintelligible) shit with mine and get jiggy." Jamar BARNES responded, "hell no, leave mine, I got my own shit (unintelligible)." Jamar BARNES later stated, "go in

my room and get the fuckin' (unintelligible) thing." Jamar BARNES then assisted Jamaine BARNES in making sure the alarm system was off in the residence. Jamar BARNES later stated, "and let me tell you don't do shit in nowhere because that camera right there in the kitchen." Jamaine BARNES then responded, "Jamar, I'm not stupid bitch, I been done, I did everything in your room." Jamar BARNES then stated, "Imma beat your ass you did what?" Jamaine BARNES later stated, "listen...I didn't do nothin' as far as dusty shit, no, come on bitch." Jamar BARNES responded, "no, that's the other one bitch … yer other place … you go to the other place." Jamar BARNES later stated, "listen stupid motherfucker, don't carry no bag, nothin' outta there (unintelligible) briefcase, nothing."

169. Based on this intercepted call, I believe that Jamaine BARNES was utilizing Jamar BARNES' residential bedroom to possibly manufacture counterfeit pharmaceutical tablets. I further believe that Jamar BARNES admonished Jamaine BARNES to not use his (Jamar BARNES') room for the messy parts ("dusty shit") of the manufacturing process but instead to use "the other place" (possibly 1139 Parma Road). I also believe that Jamar BARNES was warning Jamaine BARNES not to manufacture in the kitchen because there was a camera there. I also believe that Jamar BARNES was admonishing Jamaine BARNES to not carry anything conspicuous out of his (Jamar BARNES') residence afterwards (possibly in reference to finished product) in a "bag" or "briefcase."

170. At approximately 8:24 p.m., Jamaine BARNES received another incoming call from 209-490-9635, used by Jamar BARNES. During this intercepted call, Jamaine BARNES stated, "there's some shit in the closet, Imma put the sheet over it." Jamar BARNES responded, "I know."

171. Based on this intercepted call, I believe Jamaine BARNES was possibly notifying Jamar BARNES that some drugs ("shit") were in the closet which Jamaine BARNES was going to cover with a sheet. Furthermore, at approximately 8:18PM, in between the previously detailed calls at 8:13PM and 8:24PM during which Jamaine BARNES was believed to be inside of Jamar BARNES' residence, the authorized GPS ping on Jamaine BARNES telephone (**Target Telephone 1**) indicated that Jamaine BARNES was in the area of 723 Bedlow Drive with an accuracy radius of 3,339 meters.

172. The next day, May 6, 2019, at approximately 5:25 p.m., Jamaine BARNES placed another outgoing call to 209-490-9635, used by Jamar BARNES. During this intercepted call, Jamar BARNES informed Jamaine BARNES that a social worker was coming over to Jamar BARNES' residence later that day. Jamaine BARNES then asked, "did put that whoopty up?" Jamar BARNES responded, "(unintelligible) everything." Jamaine BARNES then responded, "oh ok, so uh, we gonna finish when she get done?" Jamar

49

BARNES later responded, "yeah I'll call you when she done (unintelligible)." Jamaine BARNES then responded, "alright yeah."

173. Based on this intercepted call, I believe that when Jamaine BARNES found out that a social worker would be going to Jamar BARNES' residence later that day, Jamaine BARNES wanted to make sure that the counterfeit pharmaceutical tableting equipment and/or materials were put away out of sight from the social worker ("did put that whoopty up?").

174. A few minutes later, at approximately 5:28 p.m., Jamaine BARNES placed another outgoing call to 209-490-9635, used by Jamar BARNES. During this intercepted call, Jamaine BARNES asked, "hey what's that uh model?" Jamar BARNES responded, "nigga I don't know." Jamaine BARNES responded, "your model bitch." Jamar BARNES later stated, "I gotta look." Jamaine BARNES responded, "I think it's a DP ... DP." Jamar BARNES responded, "yeah, yeah, yeah, yeah, a thirty."

175. Based on this intercepted call, I believe that Jamaine BARNES was asking which model of pill press machine Jamar BARNES had ("hey what's that uh model?"). I further believe that Jamaine BARNES and Jamar BARNES then collaboratively identified the pill press machine to be a DP-30 model ("DP"; "thirty"). I know from my experience with this investigation and from open source queries that a "DP-30" is a pill press machine model. I further believe that this statement made by Jamar BARNES regarding his possession of a DP-30 pill press machine model validates my belief that Jamar BARNES and Jamaine BARNES are manufacturing counterfeit pharmaceutical tablets.

176. Later in the evening, Jamaine BARNES was arranging to meet with an unidentified female who uses telephone number 503-476-4328 (UF4328), subscribed to Kim JOHNSON.

177. At approximately 10:29 p.m., Jamaine BARNES sent an outgoing text message to UF4328 which stated, "723 bedlow dr."

178. At approximately 10:29 p.m., Jamaine BARNES sent another outgoing text message to UF4328 which stated, "Come here cuz."

179. However, during the timeframe of these intercepted text messages, according to the authorized GPS pings on Jamaine BARNES' phone at 10:18PM and 10:48PM, he was in the vicinity of his studio located at 4410 N. Pershing Avenue with an accuracy radius of 1,281 meters (there was no data received for the scheduled ping at 10:33PM).

Nevertheless, based on the text message which actually articulates the 723 Bedlow Drive address, I believe it further substantiates that this address is linked to Jamaine BARNES.

180. On May 7, 2019, at approximately 12:54 p.m., Jamaine BARNES placed an outgoing call to PATTERSON (925-522-6772). During this intercepted call, Jamaine BARNES notified PATTERSON that someone was going to pick him (PATTERSON) up, then Jamaine BARNES stated, "listen, you're going straight to my brother's house." PATTERSON later asked, "where's the bag?" Jamaine BARNES responded, "he's bringing the bag right now and my brother's waitin' so go over there and go straight to work."

181. At approximately 2:17 p.m., Jamaine BARNES received an incoming call from PATTERSON. During this intercepted call, Jamaine BARNES stated, "give me five hundred of 'em." PATTERSON then asked, "get out a hundred?" Jamaine BARNES responded, "five hundred." PATTERSON then clarified, "get out five hundred?" Jamaine BARNES then confirmed and PATTERSON agreed. In the background of this intercepted call, a mechanical rhythmic noise can be heard which I believe to be the sound of a pill press machine operating. At approximately 2:18 p.m., the authorized GPS ping on PATTERSON's phone indicated that he was in the area of 723 Bedlow Drive, with an accuracy radius of 1,709 meters.

182. At approximately 2:29 p.m., Jamaine BARNES made an outgoing call to PATTERSON. During this intercepted call, Jamaine BARNES stated, "bring me that five hundred real quick." PATTERSON responded, "Alright." PATTERSON then asked someone in the background, "hey you gotta bag?" PATTERSON later stated to someone in the background, "he outside." Someone in the background then asked, "who outside?" PATTERSON then responded, "your brother, he wants this." In the background of this intercepted call, the same mechanical rhythmic noise can be heard which I believe to be the sound of a pill press machine operating. At approximately 2:33 p.m., the authorized GPS ping on **Target Telephone 1** indicated that Jamaine BARNES was in the area of 723 Bedlow Drive, with an accuracy radius of 3,339 meters.

183. At approximately 2:57 p.m., Jamaine BARNES received an incoming call from PATTERSON. During this intercepted call, Jamaine BARNES asked, "it's almost done?" PATTERSON responded, "almost done, yeah it's almost (unintelligible)." Jamaine BARNES then stated, "alright." In the background of this intercepted call, the same mechanical rhythmic noise can be heard which I believe to be the sound of a pill press machine operating. At approximately 3:03 p.m., the authorized GPS ping on PATTERSON's phone indicated that he was in the area of 723 Bedlow Drive, with an accuracy radius of 3,339 meters.

51

184. Based on these intercepted calls, I believe that PATTERSON was manufacturing counterfeit pharmaceutical tablets under the direction of Jamaine BARNES, while at the residence of Jamar BARNES located at 723 Bedlow Drive, and while with Jamar BARNES. I further believe that Jamaine BARNES picked up 500 suspected counterfeit pharmaceutical tablets freshly pressed by PATTERSON at Jamar BARNES' residence located at 723 Bedlow Drive.

185. On May 11, 2019, at approximately 10:18PM, the authorized GPS pings on Jamaine BARNES and PATTERSON's phones indicated that they were both in the area of 723 Bedlow Drive with an accuracy radius of 3,339 meters. At approximately 10:21PM, Jamaine BARNES received an incoming call from 925-354-5904 subscribed to Ellen M LOUISVILLE and used by an unidentified male (UM5904). Towards the end of this intercepted call, in the background, a mechanical rhythmic noise can be heard which I believe to be the sound of a pill press machine operating. At approximately 10:27PM, Jamaine BARNES received another call from UM5904, during which Jamaine BARNES instructed UM5904 to go to the studio (4410 N. Pershing Ave). Jamaine BARNES further stated, "Imma give you what I got." UM5904 later asked, "how much is that?" Jamaine BARNES responded, "I don't know, I gotta count 'em, whatever the bag makes." In the background of this intercepted call, a mechanical rhythmic noise can be heard which I believe to be the sound of a pill press machine operating. At approximately 10:33PM the authorized GPS pings on Jamaine BARNES' and PATTERSON's phones indicated that they were both in the area of 723 Bedlow Drive with an accuracy radius of 1,709 and 3,339 meters, respectively.

186. Agents were able to confirm that 723 Bedlow Drive is the current address for Jamar BARNES based upon a domestic violence incident which occurred at the residence on April 19, 2019 during which Jamar BARNES was identified as the resident. The Stockton Police Department report for the incident lists Jamar BARNES as the suspect along with his CA driver license number. Additionally, the report also lists Jamar BARNES' telephone number as 209-490-9635. I believe that Jamaine BARNES was at the 723 Bedlow Drive residence during the previously detailed intercepted calls with Jamar BARNES and that Jamaine BARNES is utilizing Jamar BARNES' residence as an additional location for the manufacture of counterfeit pharmaceutical tablets, along with 1139 Parma Road.

187. Telephone number 209-490-9635 was subscribed in the name of Jamar BARNES at 4420 Janell Lane, Stockton, California, until the numbered was ported from T-Mobile to AT&T/Cricket on May 3, 2019, after which the number was subscribed to Jamar BARNS, 6015 Pacific Ave, Stockton, CA 95207. According to open source information,

6015 Pacific Ave is associated with a Cricket Wireless authorized retailer. A search of California DMV records revealed that Jamar BARNES lists 4420 Jannell Ln, Stockton, CA 95206 as his address of record. 4420 Janell Ln, Stockton, CA 95206 is also listed in Thomson Reuters CLEAR report as the most recent address of record for Jamar BARNES.

188. The response to a subpoena submitted to PG&E for utilities subscribers at 723 Bedlow Drive is still pending.

### *Intercepted Calls between Jamaine BARNES and Alexander WELCH on April 19 and May 1, 2019*

189. On April 19, 2019, at approximately 10:04AM, **Target Telephone 1** (Jamaine BARNES) received an incoming call from telephone number 209-898-9662, used by Alexander WELCH. During this intercepted call, WELCH stated, "Can I get a hundred? I'm about to leave some money over here right now. I gotta run to Frisco. Cuz wanted a hun'ed out there." After an apparent discussion about prices, WELCH stated, "I'ma gonna drive these mother fuckers to Frisco, bro ..." WELCH then asked, "Which uh...which one of these mother fuckers I grab, though, bro? Because cuz is at the shower." WELCH then continued by stating, "I don't want ... I don't want to grab the wrong ones. There's a little bag in here with uh ... yellow and pink ones ... or green and pink ones. There is a bag in here with some blue ones." Jamaine BARNES then replied, "Get a hundred of the blue ones." WELCH then confirmed by asking, "Oh, the blue ones?" Jamaine BARNES then replied, "Yeah."

190. During this intercepted call, I believe that WELCH was indicating to Jamaine BARNES that WELCH needed to purchase ("leave some money") one hundred counterfeit pharmaceutical or MDMA tablets ("can I get a hundred?") to further distribute to a customer located in San Francisco ("Frisco"). I further believe that during this intercepted call, WELCH was calling from within a potential stash location for counterfeit pharmaceutical or MDMA tablets ("which one of these mother fuckers I grab, though, bro? ... there's a little bag in here with uh ... yellow and pink ones ... or green and pink ones. There is a bag in here with some blue ones"). During this call, the rustling of what sounds like plastic bags can also be heard in the background. I further believe that Jamaine BARNES then directs WELCH as to which colored tablets to take ("get a hundred of the blue ones").

191. Later that same day, at approximately 5:25PM, Jamaine BARNES received another call from WELCH during which WELCH was instructed to bring Jamaine BARNES his money, which is believed to be in reference to the earlier sale of tablets.

192. Based on my training and experience with this investigation, I believe that Jamaine BARNES is overseeing a stash location for counterfeit pharmaceutical and/or purported MDMA tablets, and in this intercepted call Jamaine BARNES is directing one of his (Jamaine BARNES') sub-distributors (WELCH) to obtain tablets from the stash location in order for WELCH to further distribute the tablets to a customer in San Francisco.

193. On May 1, 2019, at approximately 11:36 a.m., Jamaine BARNES received an incoming call from telephone number 209-898-9662, used by WELCH. During this intercepted call, WELCH stated, "uh uh uh I need two fifty bro." Jamaine BARNES responded, "pull up bro."

194. Based on this intercepted call, agents believe that WELCH was ordering 250 ("I need two fifty") counterfeit pharmaceutical or MDMA tablets from Jamaine BARNES, and that Jamaine BARNES instructed WELCH to go ("pull up") to Jamaine BARNES' studio (located at 4410 N. Pershing Ave, Stockton, CA) to obtain the pills. Later, at approximately 1:28PM, the authorized GPS ping for WELCH's phone indicated that he was in the vicinity of Jamaine BARNES' studio located at 4410 N. Pershing Avenue with an accuracy radius of 8 meters.

195. Agents obtained subscriber information for telephone number 209-898-9662 and found that it listed Jeffrey Smith, 9127 West Ln, Stockton, CA 95210 as the subscriber. According to a commercial database search, a Jeffrey Smith at 9127 West Ln in Stockton is 65 years old. The voice of the individual using telephone number 209-898-9662 appeared to be a young male. I know from my training and experience that drug traffickers often use phones subscribed using false names and addresses or in the names and addresses of nominees as a method to avoid detection.

196. On April 20, 2019, at approximately 12:18PM, DEA Task Force Officer (TFO) Aaron Kacalek observed WELCH in the driver seat of a black Toyota Prius (bearing CA license plate number 6WCY640 registered to HSST CORP, 3924 Franklin Blvd, Sacramento, CA) while stopped in traffic in Stockton, CA. At the same time, another surveillance agent placed a ghost call to telephone number 209-898-9662 used by WELCH. TFO Kacalek then observed WELCH hold a phone up to his face with his right hand and answer the call. TFO Kacalek positively identified WELCH based on a comparison to WELCH's DMV photo.

197. On May 11, 2019, at approximately 4:04AM, the authorized GPS ping on WELCH's phone indicated that he was in the immediate vicinity of the Sorrento apartment complex located at 1011 Rosemarie Lane, Stockton, CA with an accuracy radius of 16 meters. At

54

approximately 9:00AM, surveillance was established on unit #109 within the Sorrento apartment complex located at 1011 Rosemarie Lane in order to confirm the residence of WELCH. At approximately 9:04PM, the authorized GPS ping on WELCH's phone indicated that he was in the immediate vicinity of the Sorrento apartment complex located at 1011 Rosemarie Lane with an accuracy radius of 16 meters. At approximately 2:33PM, the authorized GPS ping on WELCH's phone still indicated that he was in the immediate vicinity of the Sorrento apartment complex located at 1011 Rosemarie Lane, with an accuracy radius of 14 meters. At approximately 2:36PM, surveillance observed WELCH walk out from the area of apartment #109 to a vehicle which WELCH accessed and then returned to the area of apartment #109. The vehicle was described as a white Hyundai SUV, bearing CA license plate number 8JPJ516. Subsequently, WELCH came back out from the area of apartment #109 along with a Hispanic female carrying a small child in her arms and temporarily walked out of view from surveillance. At approximately 2:40PM, surveillance observed WELCH enter the driver's seat of a black Toyota, bearing CA license plate number 6WCY640. Surveillance then observed WELCH drive the Toyota out of the apartment complex. At approximately 2:45PM, surveillance observed the Toyota parked at 4410 N. Pershing Ave (Jamaine BARNES' studio). At approximately 2:48PM, the authorized GPS ping on WELCH's phone indicated that he was in the area of 4410 N. Pershing Ave with an accuracy radius of 16 meters. Later that night, at approximately 11:48PM, the authorized GPS ping on WELCH's phone indicated that he was back in the immediate vicinity of the Sorrento apartment complex located at 1011 Rosemarie Lane with an accuracy radius of 16 meters.

198. The authorized GPS pings on WELCH's phone for April 20, 2019 through the date of this affidavit show that his phone is generally in the area of 1011 Rosemarie Lane, apartment #109 during nighttime hours, with an accuracy generally ranging from approximately 8 to 16 meters.

## *Intercepted Calls between Jamaine BARNES and Kavieo WILEY on May 3 and May 5, 2019*

199. On May 3, 2019, at approximately 11:02PM, Jamaine BARNES made an outgoing call to 702-238-8253 subscribed to Kavid WILEY and used by Kavieo WILEY. During this intercepted call, Jamaine BARNES asked, "hey where the smackers at?" Following this question the call became glitchy. Eventually, WILEY stated, "open that box, it's in uh, it's in uh orange bin." Subsequently, WILEY asked, "hey bro?" Jamaine BARNES then grunted in response. WILEY continued, "you don't wanna let me take a hundred pills out there with me?" Jamaine BARNES responded unintelligibly. WILEY then stated, "alright I'll (unintelligible) come over there grab 'em."

55

200. Directly before and after this intercepted call, the authorized GPS ping on **Target Telephone 1** indicated that Jamaine BARNES was in the vicinity of his studio located at 4410 N. Pershing Ave, with an accuracy radius of 1,280 meters.

201. Based on this intercepted call, coupled with ping information, I believe that Jamaine BARNES was most likely at his studio where purported MDMA pills ("smackers") are being stored for distribution.

202. On May 5, 2019, at approximately 5:22PM, Jamaine BARNES received an incoming call from 702-466-6776 subscribed to "Red Hairs" and used by an unidentified female (UF6776). During this intercepted call, UF6776 asked, "you got some?" Jamaine BARNES responded, "yep." UF6776 then asked, "Ok I'm across the street they over there?" Jamaine BARNES then responded, "yep." UF6776 then responded, "alright."

203. At approximately 5:38PM, Jamaine BARNES received an incoming call from WILEY. During this intercepted call, WILEY stated, "you got somebody waiting here for you, Red waiting for you." Jamaine BARNES responded, "I know, take care of her." WILEY responded, "alright." Jamaine BARNES then stated, "ask her what she want." WILEY then asked someone in the background, "what did you want, how much?" Jamaine BARNES then asked, "how many she want?" WILEY then responded, "she wanted a hundred pills." Jamaine BARNES then stated, "bruh stop saying that always bruh." WILEY then asked, "what?" WILEY then stated, "Ok alright." Jamaine BARNES then responded, "you retarded bruh." Jamaine BARNES later stated, "nah stop saying that word period bruh." WILEY then responded, "alright nigga damn."

204. Based on these intercepted calls, I believe that UF6776 contacted Jamaine BARNES to purchase counterfeit pharmaceutical or MDMA tablets ("you got some") at Jamaine BARNES' studio located at 4410 Pershing Avenue in Stockton ("I'm across the street they over there?"). I further believe that Jamaine BARNES was not at his studio at the time of these intercepted calls, since the authorized ping on **Target Telephone 1** was not pinging in the area of the studio. I further believe that WILEY distributed 100 tablets ("a hundred pills") to UF6776 ("Red waiting for you") at the studio. I further believe that Jamaine BARNES was admonishing WILEY not to say the word "pills" over the telephone so as to avoid detection by law enforcement.

*__On May 9, 2019, CS-3 purchases approximately 1,000 pills containing methamphetamine from WILEY under the direction of Jamaine BARNES at the studio, 4410 N. Pershing Avenue #C-24 (during which RICHARDSON is observed at the studio amid intercepted calls regarding a purported MDMA transaction)__*

205.  On May 9, 2019, CS-3 purchased approximately 1,000 purported MDMA tablets from WILEY (AKA: "Clout") inside of unit C-24 at Jamaine BARNES' studio located at 4410 N. Pershing Avenue, Stockton, CA.  Below is a summary of events related to this controlled purchase.  Agents searched CS-3 before and after the meeting with negative results.  CS-3 was equipped with a concealed audio transmitter/recorder and video recorder during the transaction.  CS-3 was also kept under observation by agents during this transaction.

206.  At approximately 2:08PM, CS-3 walked up to the front of unit C-24 which is accessed by a stairway on the outside of the building located at 4410 N. Pershing Avenue.[11]  When CS-3 reached the door of C-24, a black male adult named "Clout" (later positively identified by CS-3 to be WILEY based on a comparison to WILEY's Nevada DMV photo) blocked CS-3 from entering the studio.  Below are still images from CS-3's video recorder (left and center photos) compared with WILEY's Nevada DMV photo (right photo).

---

[11] On May 7, 2019, at approximately 5:01PM, Jamaine BARNES received an incoming call from 209-490-6624 (unknown subscriber) utilized by an unidentified male (UM6624).  During this intercepted call, Jamaine BARNES stated that the address to his "studio" was "forty-four ten Pershing."  In a series of unrelated intercepted calls on May 2, 2019, Jamaine BARNES stated "C24" in an apparent reference to his studio location.  On April 26, 2019, surveillance observed Jamaine BARNES exit unit C-24 at 4410 N. Pershing Avenue, Stockton, CA.  Based on these intercepted calls and surveillance observations before and during the T-III investigation, I believe that Jamaine BARNES' studio is located in unit C-24.

  

207. CS-3 explained to WILEY that CS-3 was there to inquire about getting some studio time.
WILEY told CS-3 to come back around 4:00PM or 4:30PM.  CS-3 then returned to the
vehicle CS-3 had arrived in and waited in the parked vehicle in front of the studio.  At
approximately 2:30PM, surveillance observed Jamaine BARNES arrive in the parking lot
of 4410 N. Pershing Avenue driving his known vehicle, the silver 2014 Buick LaCrosse
bearing CA license plate number 8ECW699.  Jamaine BARNES then exited his vehicle
and began walking towards unit C-24, while CS-3 also exited his/her vehicle and
approached Jamaine BARNES.  CS-3 then stated to Jamaine BARNES that CS-3 was
there to make music, but then clarified that CS-3 was really there to buy pills.  Jamaine
BARNES then agreed and instructed CS-3 to come up into the studio.  CS-3 then
explained to Jamaine BARNES that CS-3 had already tried but was turned away by
"Clout."  Jamaine BARNES then scolded WILEY for turning away "business."  Jamaine
BARNES and CS-3 entered the door of unit C-24 and walked back into what appeared to
CS-3 as a music studio.  CS-3 observed approximately three rooms within the suite but
CS-3 could not completely see into all of the rooms.  CS-3 also observed approximately
six to seven other people inside of unit C-24 at the time.  CS-3 also observed clothing on
a couch and on the floor within the unit, and it appeared to CS-3 that someone may be
living there.  Once inside of the studio, Jamaine BARNES asked how many CS-3 wanted,
and CS-3 stated a "boat" (meaning 1,000 pills).  Jamaine BARNES stated that the price
would be twelve hundred ($1,200) for the smackers (MDMA) but he (Jamaine BARNES)
did not have the percs (Percocet's) or norcs (Norco's) yet.  CS-3 explained that s/he
would have to go get the money.  At approximately 2:38PM, CS-3 left the studio and
departed the area.  At approximately 2:48PM, surveillance observed Jamaine BARNES
depart from the studio in the Buick.

208. At approximately 3:12PM, CS-3 arrived back at the studio located at 4410 N. Pershing
Avenue.  CS-3 then walked up the stairs and was met again by WILEY, who this time
escorted CS-3 into unit C-24.  Once inside of the studio, WILEY went into one of the
rooms which contained a black filing cabinet, which WILEY opened and retrieved a clear

plastic bag. CS-3 observed that there were six to seven additional bags inside of the cabinet. CS-3 confirmed the bag CS-3 was buying contained 1,000 tablets. CS-3 told WILEY that CS-3 wanted to buy percs (Percocet), norcs (hydrocodone), or blues (oxycodone). WILEY indicated that they would be getting them soon. CS-3 paid WILEY for the 1,000 tablets (the agreed upon price for the tablets was $1,200 and CS-3 inadvertently paid $1,300, which was discovered by agents later after the controlled purchase). As CS-3 was leaving the studio, CS-3 asked WILEY for "Twin's" (Jamaine BARNES') telephone number. WILEY began to give the number stating "559" but then WILEY paused and instead gave CS-3 his (WILEY's) own number, which was 702-238-8253. WILEY then admonished CS-3 to be careful and stay off the line, and to use "Morse Code." CS-3 then exited the studio and returned to the vehicle which CS-3 had arrived in parked outside of the studio.

209. At approximately 3:17PM, surveillance observed Chevele "Flipp" RICHARDSON walking downstairs from 4410 N. Pershing Avenue.

    i.   Previously, at approximately 2:29PM, Jamaine BARNES received an incoming call from 510-689-4447, subscribed to Flipp RICHARDSON and used by Chevele RICHARDSON. During this intercepted call, RICHARDSON asked, "you still got some of those no face thangs?" Jamaine BARNES responded, "yep." RICHARDSON then asked, "what color is they?" Jamaine BARNES then responded, "red." RICHARDSON confirmed and then stated, "I got a possible play but a nigga wanna see 'em and shit, I, I was trying to see if you could throw me the half of 'b' and if I don't sell it to 'em (unintelligible) I just bring that shit back tonight." Jamaine BARNES responded, "(unintelligible) got one and a half left." RICHARSON later responded, "alright well uhh, I might come grab like a couple a couple hundred then." Jamaine BARNES then responded unintelligibly. RICHARDSON then asked, "alright, you over there now?" Jamaine BARNES responded affirmatively. Based on this intercepted call, I believe that RICHARDSON was requesting Jamaine BARNES to front 500 purported MDMA pills ("half a 'b'" [meaning half a 'boat'] "red" "no face thangs"). It should be noted that the pills purchased by CS-3 from WILEY on the same day at the studio appeared to be MDMA pills which were reddish in color and had no logos stamped on them ("no face").

    ii.   At approximately 3:02PM, Jamaine BARNES received another incoming call from RICHARDSON, during which RICHARDSON asked "hey I'm leaving the crib right now, you still over there?" Jamaine BARNES responded, "yep." RICHARDSON responded, "two hundred of 'em" Jamaine BARNES responded, "alright."

iii. At approximately 3:05PM, Jamaine BARNES made an outgoing call to WILEY. During this intercepted call, Jamaine BARNES stated, "hey get two hundred together for Flipp 'til I pull up." WILEY then asked, "for who?" Jamaine BARNES then responded, "Flipp." WILEY then asked, "he gonna pay you?" Jamaine BARNES then responded, "yeah." WILEY later stated, "alright bro I'm gonna get it ready."

iv. Based on these intercepted calls and surveillance observations, I believe that RICHARDSON uses the alias of "Flipp" (which matches the subscriber name on RICHARDSON's phone number) and that RICHARDSON was fronted two hundred purported MDMA pills by WILEY at the studio under the direction of Jamaine BARNES.

v. On May 10, 2019, Jamaine BARNES received an incoming call from RICHARDSON. During this intercepted call, RICHARDSON stated, "it ain't even the whole cash 350 now the nigga playin' that flat out didn't come get 'em, but yep it's 350." Jamaine BARNES responded, "It's all good." RICHARDSON then responded, "Imma bout to slide through there right now."

vi. Based on this intercepted call, I believe that RICHARDSON was arranging to return 350 fronted MDMA pills to Jamaine BARNES because RICHARDSON's customer didn't buy them ("the nigga playin' that flat out didn't come get 'em").

210. At approximately 3:24PM on May 9, 2019, CS-3 placed a recorded telephone call to WILEY at 702-238-8253. During this recorded call, CS-3 identified herself/himself as the person who had just left and bought the "music." CS-3 asked when the new music tracks they were talking about in the studio would be ready. WILEY responded, "for sure Monday," and told CS-3 he (WILEY) would call C-3 on Monday. (CS-3 had just inquired about buying Norco's, Percocet's, and oxycodone which CS-3 referred to in code as new music tracks). At approximately 3:30PM, CS-3 departed the area of the studio.

211. On May 10, 2019, a presumptive field test was conducted on the pills purchased by CS-3 from WILEY using a TruNarc drug identifier device, which produced a presumptive positive result for methamphetamine. The gross weight of the bag of pills CS-3 purchased was approximately 449 grams.

***On May 10, 2019, agents seize approximately 500 purported MDMA tablets containing methamphetamine from a parcel shipped by PATTERSON at Jamaine BARNES' direction and intended for delivery to Lamont THIBODEAUX in Houston, Texas***

212. On April 18, 2019, at approximately 8:29PM, Jamaine BARNES was contacted by telephone number 832-323-8085, subscribed to and used by Lamont THIBODEAUX. During this nearly 40-minute conversation, Jamaine BARNES and THIBODEAUX discussed a myriad of topics related to the production of counterfeit pharmaceutical tablets and/or MDMA pills, including "stamps," "dye packs," "Norco's," "Xanax," and blue Louie Vuitton's, among others. I am aware that "Louie Vuitton" logos are commonly pressed onto MDMA pills, and that the other terms mentioned above are related to the production of counterfeit pharmaceutical tablets. The 832 area code covers Houston, Texas.

213. On April 30, 2019, at approximately 10:19AM, Jamaine BARNES made an outgoing call to THIBODEAUX which did not connect. At approximately 10:22AM, Jamaine BARNES received an incoming text message from THIBODEAUX which stated, "On my bike call you right back."

214. Subsequently, at approximately 10:26AM, Jamaine BARNES received an incoming MMS from THIBODEAUX with the below photo that appeared to be of THIBODEAUX seated on a three-wheel motorcycle (based upon the context of the prior text message, coupled with a comparison to THIBODEAUX's Texas driver license photo and DMV/criminal history descriptors).



215. On May 1, 2019, at approximately 7:47PM, Jamaine BARNES received an incoming call from THIBODEAUX. During this intercepted call, THIBODEAUX asked Jamaine BARNES for an address "to shoot that bread" because THIBODEAUX was "trying to get that shit in for the weekend." Jamaine BARNES then instructed THIBODEAUX to utilize "Walmart to Walmart" and then he (Jamaine BARNES) would "blast 'em out tomorrow."

216. Based on this intercepted call, I believe that THIBODEAUX is fronting money ("shoot that bread") to Jamaine BARNES via a money remitter service at Walmart ("Walmart to Walmart") in exchange for counterfeit pharmaceutical tablets which Jamaine BARNES indicated he would then ship to THIBODEAUX ("blast 'em out tomorrow").

217. On May 2, 2019, at approximately 2:25PM, Jamaine BARNES received incoming text messages from THIBODEAUX which stated, "Send me all the rest of info my wife waiting." THIBODEAUX then stated, "at Walmart." Based on this intercepted text message, I believe that THIBODEAUX's wife was sending the money at Walmart on behalf of THIBODEAUX.

218. At approximately 8:16PM, Jamaine BARNES received an incoming call from THIBODEAUX. During this intercepted call, THIBODEAUX asked Jamaine BARNES, "you got that?" Jamaine BARNES responded, "yeah I just now got it." THIBODEAUX later asked, "when you gonna put that down?" Jamaine BARNES responded, "I'll put that motherfucker in the air in the morning." Jamaine BARNES later stated, "I been waiting for you." Jamaine BARNES later stated, "man you never sent me the address." At approximately 8:16PM that same day, Jamaine BARNES received another incoming call from THIBODEAUX. During this intercepted call, THIBODEAUX stated, "I'll put a text to you right now." At approximately 8:19PM, Jamaine BARNES received an incoming text message from THIBODEAUX which stated, "8930 Scott st 77051." At approximately 8:20PM, Jamaine BARNES received another incoming text message from THIBODEAUX which stated, "Green and blue." At approximately 8:22PM, Jamaine BARNES sent an outgoing text message to THIBODEAUX which stated, "Got it."

219. Based on these intercepted calls and text messages, I believe that Jamaine BARNES received the money that THIBODEAUX sent via a Walmart based money remitter service ("I just now got it") and that THIBODEAUX then provided Jamaine BARNES with the shipping address in Houston, Texas ("8930 Scott st 77051") to send THIBODEAUX counterfeit oxycodone ("blue") and Xanax ("green") tablets.

220. On May 3, 2019, Jamaine BARNES received an incoming MMS (Multimedia Messaging Service) message from THIBODEAUX, which was a photo of a Walmart money transfer receipt (reference number 200261057) dated May 2, 2019. The sender was listed as Julia Rosamond THIBODEAUX, 4430 Knoxville Street, Houston, TX 77051; Phone: 832-991-9025; and the recipient was listed as Jamaine BARNES. A commercial database check revealed that THIBODEAUX was married to Julia R. BEN and also associated with the 4430 Knoxville Street address. Based on the intercepted text messages on May 2, 2019, coupled with the commercial database check just described, I believe that THIBODEAUX's wife sent the money at Walmart and that this further substantiates that THIBODEAUX is the user of telephone 832-323-8085.

221. On May 4, 2019, at approximately 10:13AM, Jamaine BARNES received an incoming text message from THIBODEAUX. This text message stated, "Is that shit coming today bro been up all night running the club but still waiting on the mail man." At approximately 10:13AM, Jamaine BARNES received another incoming text message from THIBODEAUX which stated, "So yes or no." At approximately 10:14AM, Jamaine BARNES received another incoming text message from THIBODEAUX which stated, "Never sent the trickin info." At approximately 10:47AM, Jamaine BARNES sent an outgoing text message to THIBODEAUX which stated, "Monday bro !! This dumb ass bitch did two day service." At approximately 11:03AM, Jamaine BARNES received

63

another incoming text message from THIBODEAUX which stated, "Just did not want that to hit and my shit get snatched bro."

222. Based on these intercepted text messages, I believe that THIBODEAUX was following up with Jamaine BARNES regarding the parcel which should have been sent containing counterfeit pharmaceutical tablets. I further believe that THIBODEAUX was trying to obtain the tracking number for the parcel from Jamaine BARNES ("Never sent the trickin info"). I also believe that THIBODEAUX expressed concern that the parcel may have been intercepted and seized by law enforcement ("Just did not want that to hit and my shit get snatched bro").

223. On May 6, 2019, at approximately 3:15PM, Jamaine BARNES received an incoming text message from THIBODEAUX. This text message stated, "What's good bro that shit still ain't made it what's good bro." At approximately 4:05PM, Jamaine BARNES sent an outgoing text message to THIBODEAUX which stated, "I know bra I give ah day I'm watching it but I already got some in route got Wednesday so if both come u just gone owe." At approximately 4:05PM, Jamaine BARNES sent another outgoing text message to THIBODEAUX which stated, "I'll give u that track in the am."

224. Based on these intercepted text messages, I believe that Jamaine BARNES may have been stalling by indicating to THIBODEAUX that a second package was sent ("so if both come u just gone owe") to play into THIBODEAUX's fears that the parcel may have been seized by law enforcement ("my shit get snatched") as was expressed on May 4, 2019. I further believe that Jamaine BARNES indicated that a tracking number would be provided to THIBODEAUX when the parcel is supposedly sent the next morning ("give u that track in the am").

225. On May 8, 2019, at approximately 11:50AM, Jamaine BARNES received an incoming text messages from THIBODEAUX which stated, "Bro I'm trying to see what's good with my pack bro you ain't giving me no track or nothing bro I can't be setting around like that not knowing bro that ain't what I signed up for frfr." "Let me Know Something I got to pay these people to wait frfr." At approximately 11:51AM, Jamaine BARNES received an incoming text message from THIBODEAUX which stated, "Twin I ain't felling this shit at all bro nothing that we saying going that way frfr bro hit me and tell me something bro frfr." At approximately 11:52AM, Jamaine BARNES placed an outgoing call to THIBODEAUX. During this intercepted call, Jamaine BARNES and THIBODEAUX argued about the shipment and Jamaine BARNES threatened to return THIBODEAUX's money or "fly down here to California and pick your own shit up."

226. Later on the same day, Jamaine BARNES sent two outgoing MMS messages (photos) to THIBODEAUX. The first photo was of a parcel addressed to 8930 Scott Street, Houston, TX 77051, United Stated "for Alvin J." with a return address of "from Alex R.," 341 W. Howard St., Stockton, CA 95206, United States. The second photo was of a USPS receipt which listed the tracking number EJ017352593US.

227. After learning of the potential parcel being shipped to the 8930 Scott St, Houston, Texas 77051 address, DEA agents coordinated with U.S. Postal Service (USPS) Inspectors to put a watch on the address.

228. On May 9, 2019, USPS notified DEA that a parcel had been intercepted being shipped to the 8930 Scott St, Houston, TX 77051 address to a recipient named "Alvin J" (i.e, **THE PARCEL**). The sender name and address for **THE PARCEL** was listed as "Alex R., 314 W. Howard St, Stockton, CA 95206." **THE PARCEL** was mailed on May 8, 2019. **THE PARCEL** remained in the custody of U.S. Postal Inspectors pending the issuance of an authorized search warrant. USPS also provided DEA with surveillance photos of the individual who shipped the parcel, whom TFO Kacalek identified to be PATTERSON based on a DMV photo and prior surveillance observations of PATTERSON. Below is one of the surveillance photos provided by USPS:



229. On May 10, 2018, a federal search warrant (2:19-SW-411 AC) was obtained and executed on the intercepted parcel, resulting in the seizure of approximately 500 purported MDMA tablets. The tablets were field tested using a TruNarc drug identifier device and tested presumptive positive for methamphetamine. The tablets were identical in appearance to those purchased by CS-3 the day before on May 9, 2019, at Jamaine BARNES's studio.

*On May 14, 2019, CS-3 purchases approximately 3,000 purported MDMA pills containing methamphetamine from WILEY under the direction of Jamaine BARNES at the studio, 4410 N. Pershing Avenue #C-24, while CS-4 observes PATTERSON access 4410 N. Pershing Avenue #C-25 with a firearm*

230. On May 14, 2019, CS-3 purchased approximately 3,000 purported MDMA tablets from WILEY (AKA: "Clout") inside of Suite C-24 at Jamaine BARNES' studio located at 4410 N. Pershing Avenue, Stockton, CA. During the transaction, another DEA Confidential Source ("CS-4") observed PATTERSON exit Suite C-24 with a firearm and enter Suite C-25, and then exit C-25 and re-enter C-24. Below is a summary of events related to this controlled purchase and observations related to C-25. Agents searched CS-3 and CS-4 and their vehicle before and after the meeting with negative results. CS-3 was equipped with concealed audio transmitter/recorder and video recorder devices during the transaction. CS-3 and CS-4 were also kept under visual observation by agents when possible during this transaction; otherwise agents monitored the audio transmissions.

231. At approximately 1:26PM, CS-3 placed a recorded telephone call to 702-238-8253, used by WILEY. During this recorded call, CS-3 negotiated the future purchase of purported MDMA ("smackers").

232. Subsequently, CS-3 and CS-4 arrived together in the same vehicle at 4410 N. Pershing Avenue. CS-3 observed Jamaine BARNES standing near the building leaning up against another vehicle in the parking lot. CS-3 greeted Jamaine BARNES, who then informed CS-3 that "Clout" (WILEY) was upstairs (in the studio). CS-3 then began to walk up the stairs towards the studio, when Jamaine BARNES yelled out, "thirty-six, right?" CS-3 then responded that s/he had already arranged with "Clout" (WILEY) to pay "three" ($3,000 for 3,000 tablets). Jamaine BARNES then laughed and said he was just messing with CS-3 and wanted to make sure CS-3 was keeping it real. CS-3 laughed in response and then continued upstairs to unit C-24 while Jamaine BARNES remained in the parking lot near the sidewalk.

66

233. Upon reaching the door for C-24, CS-3 knocked and asked for "Clout" (WILEY), and then CS-3 was invited inside of C-24. CS-3 was then led to another room within C-24 by the unidentified black male adult who answered the front door. After knocking on the door of the inner room, CS-3 opened the door and entered to find WILEY seated in a chair near the wall. After greeting one another, WILEY continued counting out the tablets which CS-3 later purchased. CS-3 and WILEY engaged in small talk while WILEY finished bagging the tablets. CS-3 then counted out $3,000 in Official Advanced Funds for WILEY. CS-3 then took the tablets from WILEY, while WILEY began inspecting all of the $100 bills for counterfeits. Below are still images from the footage taken by CS-3's surreptitious video recording device, showing WILEY holding the tablets purchased by CS-3.



234. At this time, a light complected black male adult wearing a red shirt entered the room with CS-3 and WILEY. (TFO Kacalek later reviewed video footage from the operation and identified the individual in the red shirt to be PATTERSON). PATTERSON asked WILEY where the "usalamas" were, which CS-3 understood to mean firearms. WILEY responded to PATTERSON, indicating that they (the guns) were over there and pointed to two file cabinets. PATTERSON then walked over to a small black two-drawer cabinet and opened the top drawer. Inside of the drawer was a black .40 caliber handgun. PATTERSON then retrieved the handgun and left the room. PATTERSON then walked back into the room where CS-3 and WILEY were and retrieved a large assault rifle from the ceiling which was concealed on top of a ceiling tile. CS-3 described the rifle as an "AK-47." TFO Kacalek reviewed the video footage from the operation and was able to see the black file cabinet and PATTERSON standing on a chair to access the ceiling tile (see still image from the video below; it should be noted that the time stamps on the video still shots are inaccurate because the settings were not updated properly) but the video angle did not capture footage of the handgun or rifle. However, TFO Kacalek could hear CS-3 and WILEY talking about the handgun and rifle being removed by

PATTERSON.  WILEY stated that they were removing the guns because there was someone coming to the studio to do a recording who was on an ankle monitor.



235.   After PATTERSON left the room, CS-3 expressed interest to WILEY in purchasing "oxys" when WILEY had them available for sale.  WILEY indicated that they were just waiting on a "piece" from far away.  CS-3 then concluded the meeting and exited the studio before departing the area with CS-4 in the same vehicle.  It should be noted that during the operation, while CS-3 was inside of Suite C-24, CS-3 was offered a blunt of marijuana to smoke.  In an attempt to maintain credibility, CS-3 accepted the blunt and pretended to take a "hit" but in actuality did not inhale.  After the operation, CS-3 notified agents of these events.

236.   While CS-3 was still in the studio, CS-4 (who was waiting outside the studio in a parked vehicle) observed a black male wearing a red shirt exit Suite C-24 carrying a rifle and then enter Suite C-25, and subsequently exit C-25 without the rifle and re-enter C-24.   It should be noted that CS-4 is currently working with law enforcement for monetary compensation.  CS-4 has criminal history that includes felony arrests for weapons possession, robbery, carjacking, and assault with deadly weapon. CS-4 has convictions for robbery and misdemeanor driving violations.  Agents have been able to independently corroborate much of the information provided by CS-4 related to the activities of PATTERSON with regards to firearms through audio/video recordings.  I am not aware of CS-4 providing false or misleading information during this investigation.  For these reasons, I believe CS-4 to be reliable.

237.   On May 15, 2019, a presumptive field test was conducted on the pills purchased by CS-3 from WILEY using a TruNarc drug identifier device, which produced a presumptive positive result for methamphetamine.  The gross weight of the bag of pills CS-3 purchased was approximately 1,630.2 gross grams.

238. Based on the information garnered from this controlled purchase, I believe that Jamaine BARNES and his co-conspirators utilize Suite C-25 (in addition to Suite C-24) at 4410 N. Pershing Ave to stash firearms and possibly other contraband.

### *Additional Information Related to 2518 Briarcliff Drive, 4420 Janell Lane, and 2229 Royal Street*

239. Subpoena responses received from PG&E in 2018 and again in May 2019 indicated that the utilities at 2518 Briarcliff Drive were subscribed to Horace HORTON, who is believed to be the father-in-law of Jamaine BARNES.

240. On April 18, 2019, at approximately 3:30AM (on the first day of authorized wire interception over **Target Telephone 1**), an authorized vehicle tracker was installed on Jamaine BARNES' Buick while it was parked in the driveway of 2518 Briarcliff Drive, which was established to be Jamaine BARNES' residence at the time. During the course of wire interception, it became apparent that Jamaine BARNES and his wife, Jael BARNES, were experiencing marital problems which led to Jamaine BARNES moving out of 2518 Briarcliff Drive. These marital problems reached their peak on or about May 2, 2019 which resulted in Jamaine BARNES sending several text messages to his children regarding his intentions of moving out. Subsequently, wire interceptions, surveillance, vehicle tracking, and authorized GPS ping information has revealed that Jamaine BARNES now stays at various locations to include his studio at 4410 N. Pershing Ave and even hotels. However it is not known definitively whether or not Jamaine BARNES has in fact moved all of his belongings out of 2518 Briarcliff Drive. Authorized GPS ping and vehicle tracker information has revealed that Jamaine BARNES still frequents 2518 Briarcliff Drive. For example, on May 9, 2019, agents observed Jamaine BARNES driving the Buick (with two children believed to be his) arrive at his studio located at 4410 N. Pershing Ave. At approximately 2:48PM, agents observed Jamaine BARNES depart 4410 N. Pershing Ave driving the Buick. Subsequently, throughout the remainder of the day, vehicle tracker information for the Buick revealed that it stopped on multiple separate occasions at 2518 Briarcliff Drive at approximately 3:21PM, 5:45PM, 6:33PM, 11:36PM, and then 4420 Janell Lane at 11:48PM. The tracker on the Buick further revealed that Jamaine BARNES most likely spent the night of May 9, 2019 at his 4410 N. Pershing Ave studio. On the morning of May 10, 2019, the tracker on the Buick revealed that it departed 4410 N. Pershing at approximately 8:15AM and arrived at 2518 Briarcliff Drive at approximately 8:27AM. Based on these surveillance observations coupled with vehicle tracking information, I believe that although Jamaine BARNES may not reside at 2518 Briarcliff Drive, he still frequents the location regularly and therefore may still keep some of his belongings there. Jamaine BARNES continues to list 2518 Briarcliff Drive as his address with DMV.

241. On April 26, 2019, at approximately 2:35PM, surveillance observed a black Toyota Solara bearing CA license plate number 7ZYA087 parked in the driveway of 4420 Janell Lane. It should be noted that Jamaine BARNES had recently been observed by surveillance in the Solara on multiple occasions within the prior week. However, agents were not able to positively identify the black male adult sitting in the driver's seat on this occasion while the vehicle was parked in the driveway at 4420 Janell Lane, but agents were able to rule out it being Jamaine BARNES based on the unidentified individual's stature.

242. At approximately 2:37PM, the authorized GPS ping on **Target Telephone 1** indicated that Jamaine BARNES was in the vicinity of 4420 Janell Lane with an accuracy radius of 3,339 meters. Later on April 26, 2019, at approximately 6:42PM, surveillance observed Jamaine BARNES departing in the Solara from his studio located at 4410 N. Pershing Ave.

243. THOMPSON is currently on probation with a listed address of 2229 Royal Street, Stockton, CA. THOMPSON also currently lists 2229 Royal Street as her address with CA DMV. According to CA DMV, there are also at least two vehicles currently registered to THOMPSON and Calvin CROSBY at 2229 Royal Street, Stockton, CA.

## SUMMARY OF EVIDENCE RELATED TO SEARCH LOCATIONS

244. **4410 N. Pershing Avenue, #C-24** (Stash Location and Distribution Center)
    i. On May 9, 2019, CS-3 purchased approximately 1,000 pills containing methamphetamine from this location. (¶¶ 206-208; 210-211)
    ii. On May 14, 2019, CS-3 purchased approximately 3,000 pills containing methamphetamine from this location. (¶¶ 230-238)
    iii. April 26, 2019 surveillance observation of Jamaine BARNES exiting unit C-24 at 4410 N. Pershing Ave (¶ 206 n.11)
    iv. April 26, 2019 calls in which Jamaine BARNES discusses meeting RICHARDSON at the "studio" apparently to distribute pills to him. (¶ 131)
    v. May 2 and 7, 2019 calls in which Jamaine BARNES gives 4410 Pershing as the address to his "studio" and then states "C24" in apparent reference to his studio location. (¶ 206 n.11)
    vi. May 1, 2019 call in which Jamaine BARNES instructs WELCH to "pull up" in response to WELCH stating, "I need 250." Less than two hours later, WELCH's phone's ping shows him at 4410 N. Pershing Ave., with an accuracy radius of 8 meters. (¶¶ 193-194)

    vii.    May 9, 2019 surveillance observation of RICHARDSON leaving unit C-24 within minutes of calls about RICHARDSON picking up 200 pills from Jamaine BARNES.  (¶ 209)

245. **1139 Parma Road** (Stash House and Pill Press Location)
    i.    April 19, 2019, Jamaine BARNES' Buick is at 1139 Parma Road about 45 minutes after he tells WATTS to "put one together" and that he would "be there right now." (¶¶ 93-95)
    ii.    April 20, 2019, Jamaine BARNES' Buick is at the 1139 Parma Road amid calls with PATTERSON and Jamar BARNES about pressing pills.  (¶¶ 96-103)
    iii.    April 22, 2019, Jamaine BARNES' Buick is at 1139 Parma Road amid calls about selling "two boats" and shortly after telling WATTS "Imma pull up." (¶¶ 104-110)
    iv.    April 26, 2019, Durango leaves 1139 Parma Road before meeting with Tashawn DICKERSON to supply methamphetamine-laced pills later seized by CHP. Jamaine BARNES was observed at 1139 Parma Road about 22 minutes before telling DICKERSON "I'm finishing right now" (referring to DICKERSON's order of pills) and then directing DICKERSON to meet him at the gas station where the Durango met with him.  (¶¶ 137-148)
    v.    April 30, 2019, Jamaine BARNES and WATTS phones ping in the area of 1139 Parma Road shortly after calls in which Jamaine BARNES instructs WATTS, "I need one" and "bring me the bag" because "I'm pulling up right now."  (¶¶ 113-116)
    vi.    PG&E utilities in the same name as the registered owner for a car registered to the same address (2032 Black Rose Ln) as WATTS lists with the DMV and as the subscriber address for WATTS' cell phone.  (¶ 118)

246. **723 Bedlow Drive** (Pill Press Location and Residence of Jamar BARNES)
    i.    May 5, 2019 calls between Jamaine and Jamar BARNES apparently about pressing pills (¶¶ 160-161; 166-171)
    ii.    May 5, 2019, WELCH's phone pings within 9 meters of 723 Bedlow Drive after returning from Los Angeles on behalf of Jamiane BARNES and before traveling to the studio at 4410 N. Pershing.  (¶¶ 156-159; 163-164)
    iii.    May 5, 2019, Jamaine BARNES' phone pings in the area of his studio at the same time as WELCH's phone and then moves to the area 723 Bedlow Drive, during which time Jamaine and Jamar BARNES talk on the phone about Jamaine being at Jamar's house and possibly pressing pills.  (¶¶ 165-171)
    iv.    May 6, 2019, Jamaine and Jamar BARNES identify Jamar's pill press model number as a "DP-30." (¶¶ 174-175)

     v.     May 6, 2019, Jamaine BARNES texts "723 bedlow dr" to an unidentified female. (¶¶ 176-177)

     vi.    May 7, 2019, Jamaine BARNES instructs PATTERSON to go "straight to my brother's house." Less than 2 hours later, BARNES instructs PATTERSON to bring him "five hundred." PATTERSON asks someone in the background, "hey you gotta bag?" and then says "your brother" is outside and "he wants this." In the background, the apparent sound of a pill press machine operating can be heard. Around this time, the pings on PATTERSON's and Jamaine BARNES' phones were in the area of 723 Bedlow Drive. (¶¶ 180-184)

     vii.   May 11, 2019, Jamaine BARNES' and PATTERSON's phones pinging in the area of 723 Bedlow Drive at the same time as calls during which Jamaine BARNES directs UM5904 to the studio and then says "Imma give you what I got" and "I gotta count 'em, whatever the bag makes." In the background, the apparent sound of a pill press machine operating can be heard. (¶ 185)

     viii.  April 19, 2019, Stockton Police Report of a domestic violence incident during which Jamar BARNES was identified as the resident of 723 Bedlow Drive and listed his CA driver's license number and current phone number. (¶ 186)

247. **2518 Briarcliff Drive** (Recent Residence of Jamaine BARNES)

     i.     Shipping address for eBay account that made bids on pill dies and pill press parts in 2017. (¶¶ 52-55)

     ii.    March 29, 2018, Jamaine BARNES drove with REESE to 2518 Briarcliff Drive shortly before driving REESE to REESE's vehicle; CHP then stopped REESE and seized more than 100 heroin-laced pills, believed to be supplied by Jamaine BARNES. (¶¶ 62-67)

     iii.   May 9 and 10, 2019 surveillance and vehicle tracking information for the Buick show Jamaine BARNES frequenting 2518 Briarcliff despite Jamaine BARNES informing his children on May 2, 2019 that he intended to move out based on marital problems and subsequent information that since then BARNES has been staying at various locations, including his studio and hotels. (¶ 240)

     iv.   Jamaine BARNES lists 2518 Briarcliff Drive as his DMV address. (¶ 240)

248. **4420 Janell Lane** (Recent Residence of Jamar BARNES)

     i.     March 2018, USPS finds pill press dies in a package shipped to "Deontae" (Jamar's middle name) BARNES at 4420 Janelle (misspelled) Lane, Phone 5103095370, which is a number previously used by Jamaine BARNES. (¶ 61)

     ii.    May 5, 2019 intercepted call with Charlotte SYLVA, believed to be Jamaine and Jamar BARNES' mother, about Jamar having a gun in her house. SYLVA's subscriber address is 4420 Janell Lane. SYLVA is also the PG&E utilities

subscriber as of May 2019 and lists "4420 Junell Ln" as her address with the DMV. (¶ 162)

iii.    Jamar BARNES lists 4420 Janell Lane as his address with the DMV and it is his most recent address of record in the Thomson Reuters CLEAR report. It also was his subscriber address for his phone until he changed it to the address for a Cricket Wireless retailer on May 3, 2019. (¶ 187)

iv.    April 26, 2019, a Toyota Solara used by Jamaine BARNES was seen in the driveway at 4420 Janell Lane. (¶ 241)

v.    May 9, 2019, vehicle tracker on Jamaine BARNES' Buick showed it at 4420 Janell Lane. (¶ 240)

249. **32 W. Willow Street** (Residence of Vincent PATTERSON)

    i.    PATTERSON's current residence. *See* ¶¶ 121-123.

250. **1011 Rosemarie Lane, Apt. 109** (Residence of Alexander WELCH)

    i.    WELCH's current residence. *See* ¶¶ 197-198.

251. **411 S. Stanislaus Street, Apt. J205** (Residence of Chevele RICHARDSON)

    i.    RICHARDSON's current residence. *See* ¶¶ 124-128.

252. **Silver 2014 Buick LaCrosse, 8ECW699** (Vehicle Used by Jamaine BARNES)

    i.    April 20, 2019, Jamaine BARNES seen exiting the front door of 1139 Parma Road and driving away in the Buick. (¶ 97)

    ii.    April 23, 2019, Jamaine BARNES seen driving the Buick and meeting with RICHARDSON near RICHARDSON's residence. (¶¶ 127-128)

    iii.    May 9, 2019, Jamaine BARNES seen driving the Buick right before selling approximately 1,000 pills to CS-3. (¶ 207)

253. **Blue 2004 Dodge Durango, 5HAY528** (Vehicle Used to Deliver Methamphetamine-Laced Pills to Tashawn DICKERSON)

    i.    April 26, 2019, Durango observed departing Parma and then meeting with DICKERSON before DICKERSON was stopped and arrested with pills. Intercepted calls show Jamaine BARNES supplied the pills to DICKERSON. (¶¶ 137-148)

254. **2229 Royal Street** (Residence of Johnesha THOMPSON and Former Stash House and Pill Press Location)

    i.    CS information corroborated by multiple emails and surveillance that Jamaine BARNES and THOMPSON used 2229 Royal Street as a pill press location and stash house in 2016 and 2017. (¶¶ 20-21, 32-37, 41-42, 44-48, 55)

ii. Pill press part shipped to 2229 Royal Street in September 2017 (¶ 50)

iii. Surveillance observations of someone removing items from 2229 Royal Street to a car used by Jamaine BARNES on the day after THOMPSON's November 16, 2017 arrest in Arizona. (¶ 59)

iv. THOMPSON lists 2229 Royal as her current address with DMV and with her probation officer. There are at least two vehicles currently registered to THOMPSON and Calvin CROSBY at 2229 Royal Street. (¶ 243)

v. April 28, 2019 call in which THOMPSON alludes to Jamaine BARNES' ongoing drug trafficking business. (¶ 155)

vi. Drug traffickers often maintain records for a long period of time. (¶¶ 270-271)

255. **4410 N. Pershing Avenue, #C-25,** (Firearms Stash Location for the Jamaine BARNES DTO)

i. BARNETT accessed Suite C-25 immediately before and after selling approximately 301 counterfeit oxycodone pills containing fentanyl to CS-3 on October 19, 2018. (¶¶ 75-76)

ii. Jamaine BARNES subsequently referred to the location where BARNETT had sold CS-3 the pills as his "studio" during a recorded call with CS-3 on October 29, 2018. (¶¶ 84-85)

iii. Sometime between October 2018 and April 2019, the door to Suite C-25 is boarded up and Jamaine BARNES begins using Suite C-24 as his studio. Surveillance photos from May 11, 2019 show that the door to Suite C-25 has been repaired. (¶ 75 n. 6)

iv. On May 14, 2019, CS-4 observes a black male wearing a red shirt exit Suite C-24 carrying a rifle and then enter Suite C-25, and subsequently exit C-25 without the rifle and re-enter C-24. (¶ 236)

## AFFIANT'S EXPERIENCE REGARDING ITEMS TO BE SEIZED

256. Based on my training and experience and on consultations with other federal, state and local law enforcement personnel, I believe the following to be true:

257. Persons involved in the distribution of controlled substances often maintain at their residences, outbuildings, secondary residences, businesses, and vehicles, quantities of controlled substances, as well as paraphernalia for manufacturing, use, packaging, and distribution of controlled substances. Drug traffickers also maintain records relating to their trafficking activities in these same places. These records include personal calendars, address/telephone books, and papers reflecting the names, addresses, pager, telephone, and fax numbers relating to their drug trafficking associates. These records can be in written form. Drug traffickers also keep stored messages and telephone numbers relating

74

to their trafficking activities within electronic devices. Further, drug traffickers often keep photographs and audio/video recordings depicting themselves and their associates, as well as their assets and controlled substances. They may also keep electronic equipment used for counter surveillance including scanners, cameras, monitors, and anti-bugging devices.

258. Premises and vehicles used by individuals involved in drug dealing usually contain articles of personal property showing the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premise or property.

259. Persons involved in the distribution of controlled substances often maintain records and ledgers listing their trafficking activities in these same places. These records are kept to keep track of the ordering, purchasing, storage, distribution and transportation of controlled substances. After drugs are sold, documentary records and ledgers often remain for long periods of time to memorialize past transactions, track the status of accounts receivable and accounts payable, and to record the names and telephone numbers of suppliers, customers and co-conspirators. These records are often maintained not only on paper, but also as electronic or digital data in the form of computer hardware and software.

260. Individuals involved in drug trafficking often use telephones, cellular telephones, electronic pagers, beepers, e-mail devices, text messaging, and voice mail and/or answering machines to conduct their business. Individuals involved in drug trafficking must often rely on others to obtain drugs and to help obtain, market, distribute, and/or protect drugs. To achieve some of the aforementioned objectives, I am aware that drug distributors will often, among other methods, have a courier transport drugs or drug proceeds or ship controlled substances/drug proceeds through the mail or by common carrier. Evidence related to the identities of these co-conspirators are often maintained in these locations.

261. Individuals involved in drug trafficking often maintain large amounts of U.S. currency to maintain and finance their on-going drug business. In addition, assets generated by their drug business are typically kept on-hand by drug dealers to avoid detection by authorities and/or reporting requirements. Individuals involved in drug trafficking often attempt to legitimize the source of these profits. In order to do this, they attempt to secrete, transfer and conceal the money by, among other way: (a) Placing assets in names of nominees to avoid detection, while still maintaining control of the assets; (b) Laundering money through what appears to be a legitimate business or businesses; (c) Hiding money in their homes, safes, or safety deposit boxes; and (d) Using money to buy assets which are hard

to trace by law enforcement.  Records of these transactions are often found in the aforementioned locations.

262.  Additionally based on my training and experience and the training and experience of other investigators, I know persons involved in narcotic trafficking acquire personal and real property with their narcotic proceeds, and maintain evidence of financial transactions related to obtaining, transferring, secreting, or the spending of large sums of money made from drug trafficking activities.  These records include bank statements, passbooks, money drafts, checkbooks, tax returns, loan statements, escrow files, and wire transfer records.  Persons involved in drug trafficking will often convert the currency into cashier's checks, bearer bonds, precious metals, gold, diamonds, and other jewelry in an attempt to hide large amounts of currency, and that evidence of such will be located at the described locations.

263.  Individuals involved in drug dealing often take, or cause to be taken, photographs of themselves, their associates, their property, and/or their drugs, and usually maintain these photographs in the aforementioned locations.

264.  Individuals involved in drug trafficking often maintain weapons, firearms, and ammunition on their person, in their residences, and/or in their vehicles in order to protect themselves and guard their drugs and drug profits, and for enforcement purposes during drug transactions.  These weapons and firearms can be used, and often are used, as an instrumentality of the crime of drug possession and distribution.  Therefore, I am requesting permission to seize weapons, firearms, and ammunition that may be found at the premises or in the vehicles to be searched, as indicated in Attachment B-1.

265.  Individuals involved in drug trafficking often conceal evidence of their involvement in vehicles and outbuildings in order to prevent detection and seizure by law enforcement conducting lawful search warrants at residences.  Therefore I am requesting permission to search all outbuildings located at each of the locations requested.

266.  Your affiant further believes that persons involved in the distribution of drugs will store items, further described in Attachments B-1 and B-2, which is incorporated herein by reference, and that those items are used by drug traffickers in furtherance of their drug trafficking, or are obtained by drug traffickers as a result of their drug trafficking.

267.  Based on my training, experience and conversations with other experienced agents, I am familiar with the methods and practices used by individuals and organizations involved in illicit activities that generate large amounts of income.  These methods include cash purchases, the purchasing of numerous monetary instruments with cash in amounts less

76

than $10,000, the use of aliases and nominees, the use of businesses as "front" in an attempt to legitimize and conceal their activities and the use of "off-shore" banking in an attempt to break the paper trail. These and other schemes are commonly referred to as "money laundering".

268. Individuals normally maintain records of their financial activity, such as receipts for expenditures by cash and check, bank records, and other financial documents, in their personal residences. Furthermore, individuals engaged in an income-producing business keep records of the financial activities of the business for numerous reasons and often use accounts to complete financial statements and tax returns for their business and personal returns.

269. Persons engaged in illegal activities and/or money laundering frequently retain records of their transactions within their residence, place of business, rented storage units, vehicles, or other places under their control. These records may be in the form of written notes and correspondence, receipts, negotiated instruments, contracts, bank statements, and other records. Records of this kind are also often stored on computer media.

270. Persons engaged in illegal activities and/or money laundering often maintain such records or long period of time, particularly when they are involved in ongoing criminal conduct over a long period of time. Based on my experience and review of *United States v. Greany*, 929 F.2d 523 (9th Cir. 1991), where there is evidence that the criminal activity is long-term ongoing criminal activity, it is more likely that evidence will be kept for long periods of time. In addition, based on *United States v. Angulo-Lopez*, 791 F. 2d 1394, 1399 (9th Cir. 1986), I believe that evidence of a continuous pattern of drug dealing may be found where the drug dealers reside.

271. There are many reasons why criminal offenders maintain evidence for long periods of time. The evidence may be innocuous at first glance (e.g., financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, checkbooks, video recordings and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials, computer hardware and software), but have significance and relevance when considered in light of other evidence. The criminal offender may no longer realize he/she still possesses the evidence.

272. Individuals who amass proceeds from illegal activities routinely attempt to further that conduct and/or conceal the existence and source of their funds by engaging in financial transactions with domestic and foreign institutions, and others, through all manner of

77

financial instruments, including cash, cashier's checks, money drafts, traveler's checks, wire transfers, etc. Records of such instruments are routinely maintained at the individual's residence or place of business.

273. The terms "evidence" and "documents" as used above include all of the items of evidence more fully described in Attachments B-1 and B-2 in whatever form and by whatever means such evidence or documents, their drafts or their modifications may have been created or stored.

## **REQUEST TO SEAL**

274. This Affidavit contains information regarding potential targets, which if unsealed may jeopardize the very information sought to be gained by these search warrants. In light of the ongoing nature of the investigation, and the likelihood that notice to above-identified individuals may cause them to destroy evidence, flee from prosecution, and notify confederates, I request that this affidavit and the resulting search and arrest warrants be sealed on the Court's docketing system, with the exception of copies utilized by law enforcement officers participating in the investigation and a copy of the search and arrest warrants and an inventory of any items seized that will be left at the locations of the execution of the search warrants.

275. I also hereby request that search warrants be issued for the location and vehicles described in Attachments A-1 through A-12 and to seize the items described in Attachments B-1 and B-2.

276. I swear, under the penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information, and belief.

_____
Matthew T. Clayton
Special Agent
Drug Enforcement Administration

Sworn and Subscribed to me on May 15, 2019.

_____
Hon. Allison Claire
United States Magistrate Judge

Approved as to form:

_____
David W. Spencer
Assistant United States Attorney

79

### Attachment A-1

### 4410 North Pershing Avenue, Suite C24, Stockton California

Location to be Searched: **4410 North Pershing Avenue, Suite C24, Stockton California** is a business complex, located on Pershing Avenue. The major cross street is Rosemarie Lane just to the north of the location. The building is tan in color with a red Spanish style tile roof. There is a large tan wooden staircase on the exterior of the building. Within the business complex the building has large numbers "4410" aqua in color attached to the building. Suite C24 is located on the second floor of building 4410. Suite C24 is accessed by a wooden staircase on the exterior of the complex on the west side of the building. Suite C24 is clearly marked in white letters and numbers attached to the glass directly above the glass door. There appears to only be one point of entry through the glass door. Based on previous surveillance on May 9, 2019 and May 14, 2019, it appears there are three interior rooms within C24. It is estimated the combined square footage of the interior rooms does not exceed 1000 square feet.

The search of the aforementioned location shall include ANY AND ALL attachments, to include attics, basements, garages, safes, carports, outbuildings, trailers, appurtenances thereto, and all other areas within the curtilage.







### Attachment A-2

### 1139 Parma Lane, Stockton California

<u>Location to be Searched</u>: **1139 Parma Lane, Stockton California** is a two story single family residence. The closest major intersection to the west of the house is Ews Woods Bloulevard. The main body of the house is described as being tan in color, with white trim, and the roof is brown composition roof. While on Parma Lane looking at the house, the driveway and garage are on the left side of the house. The front door is to the right of the garage. In between the garage door and the front door is a white sign with the black numbers reading "1139." Above the front door there is a grey satellite dish on the roof line of the residence. There is a medium sized tree located in the front lawn area of the residence.

The search of the aforementioned location shall include ANY AND ALL attachments, to include attics, basements, garages, safes, carports, outbuildings, trailers, appurtenances thereto, and all other areas within the curtilage. The search of the location shall also include any vehicles parked on the premises, as well as the following vehicles, whether parked on the premises or nearby on the street: (1) a Hyundai vehicle bearing CA license plate number 6MIR002, registered to Kyadijah GOODMAN, 2032 Black Rose Ln, Stockton, CA; and (2) a dark grey Dodge Durango bearing license plate 7CEP591, registered to Kadrena WATTS, 2032 Black Rose Ln, Stockton, CA 95206.




<u>Attachment A-3</u>

**723 Bedlow Drive, Stockton California**

<u>Location to be Searched</u>: **723 Bedlow Drive, Stockton California** is a one story triplex residence. The closest intersection to the west of the dwelling is Beryl Drive. The main body of the triplex is tan with a hint of yellow; the triplex also has white wood trim, and a brown roof. From Bedlow Drive looking at the triplex there is a three stall carport on the right side of the house. There are no trees in the front of the triplex. From Bedlow Drive, looking at the triplex there are bushes up against the triplex on the left side of the triplex. The door to 723 Bedlow Drive is under the carport marked with the number 723.

The search of the aforementioned location shall include ANY AND ALL attachments, to include attics, basements, garages, safes, carports, outbuildings, trailers, appurtenances thereto, and all other areas within the curtilage, and any vehicles parked under the carport marked 723.

 

## Attachment A-4

### 2518 Briarcliff Drive, Stockton California

<u>Location to be Searched</u>: **2518 Briarcliff Drive, Stockton California** is a single family residence located on Briarcliff Drive. The closest cross street to the west of the location is Alee Lane. The house is light gray, almost white. There are two white columns holding up the front porch overhang. The roof is gray tile. There is a white two-car garage door that faces Briarcliff Drive. There is a white sign approximately six feet off the ground attached to the house with black numbers "2518" on the left side of the garage while facing the house from Briarcliff Drive. The house has a front lawn with plants in between the house and the lawn. The house is listed at four bedrooms, two bathrooms, and approximately 1,980 square feet.

The search of the aforementioned location shall include ANY AND ALL attachments, to include attics, basements, garages, safes, carports, outbuildings, trailers, appurtenances thereto, and all other areas within the curtilage.



### Attachment A-5

### 4420 Janell Lane, Stockton California

Location to be Searched: **4420 Janell Lane, Stockton California** is a single family two story residence located on Janell Lane in Stockton Califonia.  The closest cross street to the south of the location is Ashlynn Way.   The house is light beige in color with a gray roof.  There are two windows directly over the white two car garage door which faces west towards Janell Lane.  To the left of the garage is the front door.  In between the front door and the garage there is a white sign with black numbers which read "4420."  To the left and right of the property, when facing it from the street, there is a wooden fence separating the house from the neighbors on either side.

The search of the aforementioned location shall include ANY AND ALL attachments, to include attics, basements, garages, safes, carports, outbuildings, trailers, appurtenances thereto, and all other areas within the curtilage.



## Attachment A-6

### 32 W. Willow Street, Stockton California

<u>Location to be Searched</u>: **32 W. Willow Street, Stockton California** is a two story triplex building composed of three separate units in one structure.  The three units include 30 W. Willow Street, **32 W. Willow Street**, and 34 W. Willow Street.  For the purpose of this affidavit, we are only requesting authority to search 32 W. Willow Street.  The building is described as an older Victorian style structure with white roof, brown and green trim.  While on W. Willow Street looking at the structure, there is a driveway to the right of the house which leads back to a detached garage.  At the front of the structure there are stairs which lead to a porch.  While standing on the front porch, there are two sets of doors with black numbers above the door indicating "30" and "32".  From W. Willow Street facing the house the doors to the right are the doors with "32" above it.

The search of the aforementioned location shall include ANY AND ALL attachments, to include attics, basements, garages, safes, carports, outbuildings, trailers, appurtenances thereto, and all other areas within the curtilage.  The search of the location shall also include a silver Lincoln bearing CA license plate number 6CQP793.



## Attachment A-7

### 1011 Rosemarie Lane, Apartment #109, Stockton California

<u>Location to be Searched</u>: **1011 Rosemarie Lane, Apartment #109, Stockton California** is an apartment within the Sorrento Apartments located at 1011 Rosemarie Lane, Stockton California. The closest major intersection to the apartment complex to the west is North Pershing Avenue. Apartment 109 is located on the first floor of a two story building.  The door to Apartment 109 is brown in color.  Looking at the door there is a sign approximately six feet above the ground attached to the side of the building.  The sign is brown in color and has the numbers "109" in a cream color.

The search of the aforementioned location shall include ANY AND ALL attachments, to include attics, basements, garages, safes, carports, outbuildings, trailers, appurtenances thereto, and all other areas within the curtilage.  The search of the location shall also include: (1) a white Hyundai SUV, bearing CA license plate number 8JPJ516; and (2) a black Toyota, bearing CA license plate number 6WCY640.



### Attachment A-8

### 411 S. Stanislaus, Apartment #J205, Stockton California

<u>Location to be Searched</u>: **411 S. Stanislaus, Apartment #J205, Stockton California** is an apartment within the Gleason Park Apartments located at 411 S. Stanislaus Street, Stockton California.  The closest major intersection to the apartment complex to the south is E Church Street.  Apartment J205 is located on the second floor of a three story building.  The door to Apartment J205 is cream in color.  To the left of the door there is a sign approximately four feet above the ground.  The sign is cream in color and reads "J205" in a dark lettering.

The search of the aforementioned location shall include ANY AND ALL attachments, to include attics, basements, garages, safes, carports, outbuildings, trailers, appurtenances thereto, and all other areas within the curtilage.  The search of the location shall also include a red Mitsubishi bearing CA license plate number 7USJ305, registered to Chevele Bernard RICHARDSON, 411 S. Stanislaus St., Apt J205, Stockton, CA 95203.



**Attachment A-9**

**Buick Lacrosse 8ECW699**

<u>Vehicle to be Searched</u>: A 2014 four-door silver BUICK LACROSSE bearing California License plate **8ECW699**



**Attachment A-10**

**Dodge Durango**

<u>Vehicle to be Searched</u>: A 2004 blue DODGE DURANGO bearing California License plate

**5HAY528**





<u>Attachment A-11</u>

**4410 North Pershing Avenue, Suite C-25, Stockton California**

<u>Location to be Searched</u>: **4410 North Pershing Avenue, Suite C25, Stockton California** is a business complex, located on Pershing Avenue.  The major cross street is Rosemarie Lane just to the north of the location.  The building is tan in color with a red Spanish style tile roof.  There is a large tan wooden staircase on the exterior of the building.  Within the business complex the building has large numbers "4410" aqua in color attached to the building.  Suite C25 is located on the second floor of building 4410.  Suite C25 is accessed by a wooden staircase on the exterior of the complex on the west side of the building.  Suite C25 is clearly marked in white letters and numbers attached to the glass directly above the glass door.  There appears to only be one point of entry through the glass door.

The search of the aforementioned location shall include ANY AND ALL attachments, to include attics, basements, garages, safes, carports, outbuildings, trailers, appurtenances thereto, and all other areas within the curtilage.







## Attachment A-12

### 2229 Royal Street, Stockton California

Location to be Searched: **2229 Royal Street, Stockton California** is a one story single family residence.  The closest intersection to the north of the residence is Governor Circle.  The main body of the house is tan with blue wood trim.  The house has grey tile roof.  Looking at the house from Royal Street there is a garage on the right side of the house with a driveway on the right side of the house.  To the left of the garage is the front door.  The front door has a security gate with a window on the left side of the door.  From Royal Street looking at the house there is a chimney on the left side of the house which extends past the roof line of the house.  To the left of the front door there are the numbers "2229" in a yellow metal finish approximately six feet off the ground attached to the house.





**ATTACHMENT B-1**
**ITEMS TO BE SEIZED**

1.    Any controlled substances (including but not limited to heroin, methamphetamine, purported pharmaceutical pills, and purported MDMA pills), illegal drugs or drug paraphernalia, including scales, measuring devices, and weighing devices; precursor chemicals or other chemicals for manufacturing controlled substances; narcotics diluting or cutting agents; narcotics packaging materials, including plastic, tin foil, cellophane, jars, plastic bags, and other containers;

2.    Any pill press, pill press dies or molds, pill press parts; equipment associated with the manufacture of controlled substances, including counterfeit pharmaceutical or MDMA pills; and any chemical residues contained on or around such equipment;

3.    United States currency and foreign currency linked to drug trafficking and/or the proceeds of drug trafficking;

4.    Money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed; computer disks, computer printouts, computer codes and computer programs in addition to computer hard disks, computer screens, computer keyboards, directory disks, laptop computers, desktop computers, and all computer components which operate computers and which would reveal the receipt of proceeds from controlled substances distribution and the transfer, investment, control and disposition of those proceeds;

5.    Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of controlled substances;

6.    Cellular telephones, mobile phones, car phones, answering machines and tapes, and other communication devices which evidence participation in a conspiracy to distribute controlled substances;

7.    Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

8.    Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including travelers checks, bonds, stock certificates,

cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;

9.   Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds of the sales of controlled substances;

10.  Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

11.  Handguns, shotguns, rifles, ammunition and other firearms possessed in relation to drug trafficking or discovered in the possession of a prohibited person;

12.  Devices commonly used to conduct counter-surveillance against law enforcement including, but not limited to, scanners, police radios, surveillance cameras, recordings of surveillance footage, monitors, anti-bugging devices, and devices used to detect the presence of wiretaps, recording devices, transmitters, and/or receipts or literature describing the same;

13.  Personal property tending to show the existence and/or location of other stored narcotics including, but not limited to, storage locker receipts, records, and maps, safety deposit keys and corresponding;

14.  Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records.

15.  All records relating to violations of 21 U.S.C. § 841(a) (drug trafficking) and/or 21 U.S.C. § 846 (conspiracy to traffic drugs) involving Jamaine BARNES, Jamar BARNES, Vincent PATTERSON, Kavieo WILEY, Jeremy BARNETT, Tashawn DICKERSON, Johnesha THOMPSON, Lamont THIBODEAUX, Kadrena WATTS, Chevele RICHARDSON, and/or Alexander WELCH, including:

   a.  any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

   b.  lists of customers and related identifying information; types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions; and

   c.  any communications relating to drug trafficking.

The terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or

stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies).

## ATTACHMENT B-2
## ITEMS TO BE SEIZED

1.     Money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed; computer disks, computer printouts, computer codes and computer programs in addition to computer hard disks, computer screens, computer keyboards, directory disks, laptop computers, desktop computers, and all computer components which operate computers and which would reveal the receipt of proceeds from controlled substances distribution and the transfer, investment, control and disposition of those proceeds;

2.     Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of controlled substances;

3.     Cellular telephones, mobile phones, car phones, answering machines and tapes, and other communication devices which evidence participation in a conspiracy to distribute controlled substances;

4.     Personal telephone and address books and listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

5.     Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds of the sales of controlled substances;

6.     Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

7.     Personal property tending to show the existence and/or location of other stored narcotics including, but not limited to, storage locker receipts, records, and maps, safety deposit keys and corresponding;

8.     Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records;

9.   All records relating to violations of 21 U.S.C. § 841(a) (drug trafficking) and/or 21 U.S.C. § 846 (conspiracy to traffic drugs) involving Jamaine BARNES, Jamar BARNES, Vincent PATTERSON, Kavieo WILEY, Jeremy BARNETT, Tashawn DICKERSON, Johnesha THOMPSON, Lamont THIBODEAUX, Kadrena WATTS, Chevele RICHARDSON, and/or Alexander WELCH, including:

   a.   any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

   b.   lists of customers and related identifying information; types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions; and

   c.   any communications relating to drug trafficking.

The terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies).